**Terry L. ARCOREN, Appellant,**

v.

**Wenton PETERS and John
Schooler, Appellees.**

No. 86–5119SD.

United States Court of Appeals,
Eighth Circuit.

Submitted Oct. 14, 1986.

Decided Feb. 2, 1987.

Nora K. Kelley, Pierre, S.D., for appellant.

Robert A. Mendel, Asst. U.S. Atty., Pierre, S.D., for appellees.

Before HEANEY and WOLLMAN, Circuit Judges, and DUMBAULD,* Senior District Judge.

DUMBAULD, Senior District Judge:

Ever since *Bell v. Hood,* 327 U.S. 678, 66 S.Ct. 773, 90 L.Ed. 939 (1946) and *Bivens v. Six Unknown Agents,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971), it has been settled that, under some circumstances, by virtue of the principle *ubi jus ibi remedium,* a person whose clearly established constitutional rights are violated by federal officials may sue them directly even though no legislation by Congress exists specifically authorizing such a remedy. See 403 U.S. at 396–97, 91 S.Ct. at 2004–05 [Fourth Amendment]; *Davis v. Passman,* 442 U.S. 228, 234–48, 99 S.Ct. 2264, 2271–78, 60 L.Ed.2d 846 (1979) [sex discrimination violating equal protection component of due process clause of Fifth Amendment].

Of course caution must be observed in according the *Bivens* remedy.[1] *Bivens* itself recognizes the possible existence of "special factors counselling hesitation in the absence of affirmative action by Congress" 403 U.S. at 396, 91 S.Ct. at 2005, such as the existence of another "equally effective" remedy 403 U.S. at 397, 91 S.Ct. at 2005.[2] A *Bivens* action must be

---

* The HONORABLE EDWARD DUMBAULD, United States Senior District Judge for the Western District of Pennsylvania, sitting by designation.

1. Caution is appropriate *a fortiori* with respect to implied actions based on the Constitution, since circumspection is the rule with respect to implied actions based upon a statute. *Cort v. Ash,* 422 U.S. 66, 80–84, 95 S.Ct. 2080, 2089–91, 45 L.Ed.2d 26 (1975), lists four pertinent factors for consideration with respect to the propriety of an implied action based upon a statute. See also *J.I. Case Co. v. Borak,* 377 U.S. 426, 433, 84 S.Ct. 1555, 1560, 12 L.Ed.2d 423 (1964); *Blue Chip Stamps v. Manor Drug Store,* 421 U.S. 723, 730, 95 S.Ct. 1917, 1922, 44 L.Ed.2d 539 (1975); and *Kardon v. National Gypsum Co.,* 69 F.Supp. 512, 513 (E.D.Pa.1946) [citing *Texas & Pac. Ry. Co. v. Rigsby,* 241 U.S. 33, 39–40, 36 S.Ct. 482, 484, 60 L.Ed. 874 (1916), applying the maxim

*ubi jus ibi remedium* ]. There is serious danger that undue extension of the remedy will result in wasteful expenditure of judicial effort on unimportant questions of fact such as the sufficiency of evidence to support a search warrant, or whether bail is excessive. See *Carlson v. Green,* 446 U.S. 14, 35–36, 100 S.Ct. 1468, 1480, 64 L.Ed.2d 15 (1980) [Rehnquist, now Chief Justice, dissenting]; Frankel, Implied Rights of Action, 67 Va.L.R. 553 (1981); as well as the detailed and thorough Note, *Howard v. Pierce:* Implied Causes of Action and the Ongoing Vitality of *Cort v. Ash,* 80 Northwestern Univ.L.R. (1986) 721.

2. To the same effect, see also *Carlson v. Green,* 446 U.S. 14, 18–19, 100 S.Ct. 1468, 1471, 64 L.Ed.2d 15 (1980). *Bush v. Lucas,* 462 U.S. 367, 378, 103 S.Ct. 2404, 2411, 76 L.Ed.2d 648 (1983), speaks of "paying particular heed … to any

founded upon disregard of requirements established by the Constitution. Mere *ultra vires* action in excess of the officer's lawful authority does not suffice, 403 U.S. at 396–97, 91 S.Ct. at 2004–05. Nor does a mere tort not of constitutional dimension, nor a mere erroneous decision. *McGovern v. New York*, 229 U.S. 363, 370, 33 S.Ct. 876, 877, 57 L.Ed. 1228 (1913); *Chicago Life Ins. Co. v. Cherry*, 244 U.S. 25, 30, 37 S.Ct. 492, 493, 61 L.Ed. 966 (1917) [Holmes, J.].

In the case at bar appellant seeks *Bivens* relief for deprivation of property, namely cattle, seized and sold (without notice or hearing to appellant) by two officials of the Farmers Home Administration (FmHA) upon being informed by third parties that appellant, contrary to his obligations under the loan agreement, had neglected and abandoned the cattle, in which the FmHA had a security interest.

It should be noted that the proceeds of the sale were credited against appellant's indebtedness to the FmHA and that he was not delinquent in his monetary payments at the time of the seizure and sale; and that he contends that loss of the cattle deprived him of the opportunity to continue in the cattle business as an independent entrepreneur, relegating him to the inferior status of "hired hand."

When this case first came before this Court in *Arcoren v. Farmers Home Administration*, 770 F.2d 137, 139–40 (8th Cir.1985), we held that the *Bivens* action was not precluded by the mere existence of FmHA regulations authorizing an administrative appeal. This Court did "not decide that Arcoren had a clearly established due process right to notice and hearing or that Arcoren has proven his case on the merits. This question must be passed on initially by the district court." 770 F.2d at 141.

Upon remand the District Court granted the defendants' motion for summary judg-ment, thus deciding adversely to appellant the question left open by this Court's prior decision, whether appellant at the time of the seizure and sale had a clearly established constitutional due process right to preseizure notice and bearing. *Arcoren v. Peters*, 627 F.Supp. 1513, 1517–19 (D.S.D. 1986). To the correctness of this holding we must now turn our attention. We conclude that appellant's claim has sufficient possible merit that it should not have been foreclosed *in limine* by grant of summary judgment.

Due process is a concept with roots going back to Magna Carta [*Murray's Lessee v. Hoboken Land and Improvement Co.*, 18 How. 272, 276, 15 L.Ed. 372 (1856) ], but the *sedes materiae* for our purposes is the language of the Fifth Amendment:

> nor [shall any person be] deprived of life, liberty, or property, without due process of law.

 It will be noted that this prohibition of wrongful deprivation is in the passive voice, and is applicable against any wrongdoer. There is no requirement of "State action," as necessitated by the wording of the Fourteenth Amendment.[3] But if, as in the case at bar, the alleged wrongdoers are federal officers, a question arises as to the extent to which they enjoy "official immunity" from liability. The important public policy in favor of immunity is designed to encourage officers to perform their duties zealously without misgivings regarding the burdens of being subjected to unmeritorious and vexatious litigation. The policy has never been better expressed than by Judge Learned Hand in *Gregoire v. Biddle*, 177 F.2d 579, 581 (2nd Cir.1949) [4]:

> It does indeed go without saying that an official, who is in fact guilty of using his powers to vent his spleen upon others, or for any other personal motive not connected with the public good, should

---

special factors counselling hesitation before authorizing a new kind of federal litigation."

**3.** *U.S. v. Guest,* 383 U.S. 745, 755, 86 S.Ct. 1170, 1176, 16 L.Ed.2d 239 (1966); *U.S. v. Price,* 383 U.S. 787, 799, 86 S.Ct. 1152, 1159, 16 L.Ed.2d 267 (1966).

**4.** See also *Spalding v. Vilas,* 161 U.S. 483, 498, 16 S.Ct. 631, 637, 40 L.Ed. 780 (1896); *Nixon v. Fitzgerald,* 457 U.S. 731, 744–47, 102 S.Ct. 2690, 2698–99, 73 L.Ed.2d 349 (1982).

not escape liability for the injuries he may so cause; and, if it were possible in practice to confine such complaints to the guilty, it would be monstrous to deny recovery. The justification for doing so is that it is impossible to know whether the claim is well founded until the case has been tried, and that to submit all officials, the innocent as well as the guilty, to the burden of a trial and to the inevitable danger of its outcome, would dampen the ardor of all but the most resolute, or the most irresponsible, in the unflinching discharge of their duties.

■ As in the case of protection against double jeopardy, the immunity is not designed to insure the successful outcome of a trial, but to prevent undergoing a trial at all, in a case where immunity is applicable. *Abney v. U.S.*, 431 U.S. 651, 659–62, 97 S.Ct. 2034, 2040–41, 52 L.Ed.2d 651 (1977); *Mitchell v. Forsyth*, 472 U.S. 511, 105 S.Ct. 2806, 2815–16, 86 L.Ed.2d 411 (1985) ["The entitlement is an *immunity from suit* rather than a mere defense to liability"].

■ In the case of subordinate officers such as appellees, qualified rather than absolute immunity is applicable. *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982), where it was held that "government officials performing discretionary functions, generally are shielded from liability for civil damages insofar as their conduct does not violate *clearly established* statutory or constitutional rights of which a reasonable person would have known" [Italics supplied].[5]

A later expression of the same rule is found in *Mitchell v. Forsyth*, 472 U.S. 511, 105 S.Ct. 2806, 2814, 86 L.Ed.2d 411 (1985). It was there held that Attorney General Mitchell (who had authorized a telephone tap without a warrant[6] when not acting in a prosecutorial capacity but allegedly in the interest of national security) enjoyed only qualified immunity. It was expressly stated that his mere status as a cabinet officer was insufficient to invest him with absolute immunity (105 S.Ct. at 2814). The Court held that "Under the standard of qualified immunity [he] will be entitled to immunity so long as his actions do not violate 'clearly established statutory or constitutional rights of which a reasonable person would have known.'"[7] (105 S.Ct. at 2814). Applying that standard the Court decided that in November, 1970, it was by no means clear that such warrantless wiretaps were unconstitutional. (105 S.Ct. at 2818).[8]

■ The standard requiring that the constitutional right allegedly violated must be a *clearly established* right applies in a *Bivens* type action. *Butz v. Economou*, 438 U.S. 478, 500–501, 98 S.Ct. 2894, 2907–2908, 57 L.Ed.2d 895 (1978).

---

5. Though appellees claim absolute immunity little time need be devoted to consideration of that contention. It is true that the rationale advanced in *Butz v. Economou*, 438 U.S. 478, 509–10, 98 S.Ct. 2894, 2912, 57 L.Ed.2d 895 (1978), for absolute immunity is that the acts of officials in those categories enjoying absolute immunity tend to provoke irrational retaliatory responses from parties involved. It is also true that officers foreclosing farm mortgages, like bill collectors and tax collectors, may often by held in public disesteem with "publicans and sinners." Indeed there were threats by farmers to lynch an Iowa judge during the depression if he signed foreclosure decrees. See Dumbauld, *The Constitution of the United States* (1964) 6 n. 15.

Nevertheless, if the Attorney General of the United States (when not acting as prosecutor), cabinet officers, and presidential aides receive only qualified immunity [*Mitchell v. Forsyth*, 472 U.S. 511, 105 S.Ct. 2806, 2813, 86 L.Ed.2d 411 (1985); *Butz v. Economou*, 438 U.S. 478, 507, 98 S.Ct. 2894, 2911, 57 L.Ed.2d 895 (1978); *Harlow v. Fitzgerald*, 457 U.S. 800, 815, 102 S.Ct. 2727, 2736, 73 L.Ed.2d 396 (1982) ], it would seem that officers as far down the ladder as appellees are clearly not entitled to absolute immunity.

6. Not until a year later, in *U.S. v. U.S. District Court*, 407 U.S. 297, 320, 92 S.Ct. 2125, 2138, 32 L.Ed.2d 752 (1972), was it decided that such wiretaps were unconstitutional.

7. As Justice Stevens, concurring in the judgment in *Mitchell*, commented: "The availability of qualified immunity is hardly comforting when it took 13 years for the federal courts to determine that the plaintiff's claim in this case was without merit." 105 S.Ct. at 2824.

8. See note 6, supra.

Hence we must consider with care whether in 1980, when Arcoren's cattle were seized and sold without notice or hearing, there existed a clearly established due process right entitling him to notice or hearing.

A leading authority on notice in the due process context is *Mullane v. Central Hanover Bank*, 339 U.S. 306, 314, 70 S.Ct. 652, 657, 94 L.Ed. 865 (1950), where the Supreme Court said: "An elementary and fundamental requirement of due process in any proceeding which is to be accorded finality is notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections."

In *Mullane* the Court emphasized that "The means employed must be such as one desirous of actually informing the absentee might reasonably adopt to accomplish it." (339 U.S. at 318, 70 S.Ct. at 659).

Hence while notice by publication in a newspaper is sufficient in the case of beneficiaries of a common trust fund whose whereabouts were unknown, the Court held that where the trustee knew the names and addresses of the beneficiaries "a serious effort to inform them personally of the accounting, at least by ordinary mail to the record addresses" must be made. (339 U.S. at 318, 70 S.Ct. at 659).

A recent case involving cancellation of a prisoner's "good time credits" (which would prevent a shortening of the period of incarceration), *Superintendent, Massachusetts Correctional Institution v. Hill*, 472 U.S. 445, 105 S.Ct. 2768, 2773, 86 L.Ed.2d 356 (1985), specified as due process requirements: (1) advance written notice of the charges; (2) an appropriate opportunity to present evidence; and (3) a written statement by the factfinder of the evidence relied on and the reasons for the decision.

A pre-termination hearing has been held necessary before suspending a relief recipient from receipt of welfare benefits.

*Goldberg v. Kelly*, 397 U.S. 254, 264, 90 S.Ct. 1011, 1018, 25 L.Ed.2d 287 (1970). The crucial factor here is that termination of benefits pending determination of eligibility might deprive an eligible, needy recipient of the means of living while he waits.[9] In other situations a subsequent hearing may suffice. The *Goldberg*-type hearing, like that in the good time credit case, requires opportunity to be heard, to confront or cross-examine adverse witnesses, and a statement of reasons by the factfinder, 397 U.S. at 267–71, 90 S.Ct. at 1020–22.

Failure to afford a pre-deprivation hearing was likewise the vice found in Florida and Pennsylvania replevin statutes in *Fuentes v. Shevin*, 407 U.S. 67, 80–84, 93, 92 S.Ct. 1983, 1994–96, 2000, 32 L.Ed.2d 556 (1972). Under those statutes the possessor of chattels could be deprived of possession on the strength of nothing more than the replevying party's claim of the right to possession, without any exercise of discretion or judgment by an impartial public official.

■ We recognize of course that the determination of what process is "due" depends on the circumstances of the case, and requires analysis of the precise nature of the governmental and private interests affected. *Cafeteria Workers v. McElroy*, 367 U.S. 886, 895, 81 S.Ct. 1743, 1748, 6 L.Ed.2d 1230 (1961); *Mathews v. Eldridge*, 424 U.S. 319, 334–35, 96 S.Ct. 893, 902–03, 47 L.Ed.2d 18 (1976). In our prior *Arcoren* decision we noted that some situations are conceivable where repossession without prior notice might well be within the rights of a secured creditor. 770 F.2d at 140. For example, simple non-payment on a note when due might be an example of a plain, objectively determinable event of default not giving rise to genuine controversies or depending on subjective appraisal of a complicated fact-situation.

In the case at bar, however, it is to be remembered that Arcoren was not delin-

---

**9.** The importance of this factor seems to be minimized by the opinion in *Fuentes*, 407 U.S. at 88–90, 92 S.Ct. at 1998–99. But cf. *Mathews v. Eldridge*, 424 U.S. 319, 340–44, 96 S.Ct. 893, 905–07, 47 L.Ed.2d 18 (1976).

quent in his money payments. The alleged breach of covenant related to his duty to care for the cattle in order to preserve their value as security for his obligation to FmHA.[10] Such a duty might well be of controversial character and involve genuine factual disputes. In any event it involved the exercise of discretion and judgment, rather than an automatic and objective determination.

■ The general principles regarding need for notice and opportunity to respond as requirements of due process are fortified and brought into focus by consideration of the statutory policy and provisions of the farm relief legislation involved in the case at bar. What Congress has enacted is significant evidence of what fundamental fairness demands.[11]

Section 122 of the Agricultural Credit Act of August 4, 1978, 92 Stat. 420, 427–28, under the heading "Loan Moratorium and Policy on Foreclosures" added to existing farm legislation a new section, 7 U.S.C. 1981a, reading as follows:

> In addition to any other authority that the Secretary may have to defer principal and interest and forego foreclosure, the Secretary may permit, at the request of the borrower, the deferral of principal and interest on any outstanding loan made, insured, or held by the Secretary under this title, or under the provisions of any other law administered by the Farmers Home Administration, and may forego foreclosure of any such loan, for such period as the Secretary deems necessary upon a showing by the borrower that due to circumstances beyond the borrower's control, the borrower is temporarily unable to continue making payments of such principal and interest when due without unduly impairing the standard of living of the borrower. The Secretary may permit interest that accrues during the deferral period on any loan deferred under this section to bear no interest during or after such period: *Provided,* That if the security instrument securing such loan is foreclosed such interest as is included in the purchase price at such foreclosure shall become part of the principal and draw interest from the date of foreclosure at the rate prescribed by law.[12]

Analysis of this section indicates that Congress has authorized the Secretary of Agriculture (FmHA) to defer payments of principal and interest and to delay foreclosure for such time as to him seems necessary, if

(1) request is made by the borrower (thus by implication assuming that in some fashion the borrower has become aware of this section)[13]; and

---

10. In Paragraph III—B. of the security agreement of May 11, 1977, the debtor covenanted to "... (2) comply with such farm and home management plans as may be agreed upon ..., (3) care for and maintain the collateral in a good and husbandlike manner, ... (6) not abandon the collateral or encumber, conceal, revoke, sell or otherwise dispose of it ... or permit others to do so, without the prior written consent of Secured Party, and (7) not to permit the collateral to be ... injured or destroyed, or its value to be impaired, except by using harvested crops in amounts necessary to care for livestock covered thereby." Only in the event of established violation of these covenants was the seizure and sale of Arcoren's cattle lawful. His money payments were current, up until January 1, 1981.

11. Just as widely accepted treaty obligations often reflect the requirements of customary international law. See, *e.g.* International Court of Justice Reports 1986, p. 4, § 183, reported in International Legal Materials, Vol. 25, No. 5 (Sept. 1986), p. 1065.

12. Section 126 of the Act [92 Stat. 429] specifies that "a high priority is placed on keeping existing farm operations operating." 7 U.S.C. § 1921, note.

13. Thomas Jefferson boasted of American farmers to European friends that "ours are the only farmers who can read Homer." To St. John de Crèvecoeur, Paris, Jan. 15, 1787, 11 Boyd, *Papers of Thomas Jefferson* (1955) 44. This may be thought, today at least, to be exaggeration or hyperbole. Equally unrealistic is the expectation that the ordinary farmer "spend his extra hours in a federal depositary, probably at least one 100 miles from his farm, reading the United States Code and Federal Register." *Coleman v. Block,* 562 F.Supp. 1353, 1361 (D.N.D.S.W.Div. 1983).

(2) the borrower shows (thus by implication assuming that the borrower has an opportunity to make the showing and that the Secretary must duly hearken unto and give due consideration to such a showing)

(a) that the borrower is unable to continue making payments of principal and interest without unduly impairing the standard of living of the borrower;

(b) that such inability is temporary; and

(c) that such inability is due to circumstances beyond the borrower's control.

It is obvious that these are requirements which call for exercise of discretion and for evaluation of evidence and circumstances by the FmHA. They cannot be satisfied by the automatic ascertainment of an objectively verifiable event of default (such as non-payment of a sum certain at the time and place where it is due and payable).

The need for such discretionary evaluation is indisputable. For example, deferment is to be granted only if the debtor's inability to pay is temporary. That is not the case when "there is no reasonable prospect of ultimate repayment of the loan." Hence "it would seem that an inquiry into the borrower's ultimate ability to repay is necessary, even though the statute does not explicitly" say so. *Curry v. Block,* 738 F.2d 1556, 1563 (11th Cir.1984). A similar inquiry must ascertain the borrower's capability as a competent farmer. If his incorrigible incompetence or incurable inertia and shiftlessness, rather than weather or other natural disaster or the general state of the farm economy, is responsible for his inability to pay, it is clear that no deferment pursuant to § 1981a is appropriate. Emphatically the determinations to be made require more than automatic application of a simple objectively verifiable criterion which does not require notice and hearing.

In *Allison v. Block,* 723 F.2d 631, 634–35 (8th Cir.1983), this Court held that the FmHA must notify potential beneficiaries of the existence of § 1981a relief, and also establish procedural and substantive regulations to "implement" the statutory program. The legislative history demonstrates that Congress intended that regulations be adopted similar to those formulated in a preceding farm program relating to housing loans. It was explicitly stated that the Secretary was not free to "deny all deferral requests *ex cathedra*" and nullify the policy proclaimed by Congress (723 F.2d at 637).[14]

Both of these aspects of our *Allison* decision were followed by the Eleventh Circuit in *Curry v. Block,* 738 F.2d 1556, 1560–61 (11th Cir.1984). In *Curry* the Court pointed out that "the government now concedes that § 1981a mandates the FmHA to give borrowers notice of the availability of deferral relief." It also commented that the government's shift in position "demonstrates that it is much easier to argue an extreme position in the peaceful vacuum afforded by an appellate brief than in oral argument before a three-judge panel" (738 F.2d at 1560).

In the case at bar counsel for FmHA contended that not until *Allison* (decided December 28, 1983) did the requirements of notice and hearing arise. Hence it is argued that in 1980, when Arcoren's cattle was sold without notice or hearing, such action was not taken in defiance of a "clearly established" constitutional right.

This argument is not utterly frivolous. However, we are convinced that our decision in *Allison* was not an innovation produced by a process of "cerebral partheno-

---

14. For example, the FmHA is not free to adopt the policy that something must be done to reduce the national deficit, and that therefore all farm loans shall be liquidated and foreclosed and collection thereof accelerated upon the slightest pretext, in order to gather as much money as possible into the government's hands to be applied to reduction of the national debt. On the contrary the FmHA must heed and adhere to the policy mandated by Congress of preserving existing farm operations wherever possible when they are threatened by temporary emergencies.

genesis"[15], but a logical interpretation derived from careful scrutiny of the language and legislative history of the statute.

■ Under the circumstances of the case at bar, therefore, in evaluating the issue of fundamental fairness, we are inclined to conclude that the total extinction of Arcoren's property rights to his cattle was a deprivation without "due" process when it occurred without notice to him or any opportunity to request, and show if possible his entitlement to, the type of relief in such cases made and provided by the Congress for "farmers of skill, perservance, and dedication" who are nonetheless vulnerable, like the agricultural industry in general, "to the changing winds of time, nature, fate, and the economy."

For "Congress in 1978 clearly expressed its intent to assist farmers blown astray by these winds by granting those who could show that their inability to meet their financial obligations was temporary more time to repay their debts to the government" (723 F.2d at 638). This clearly established right, in furtherance of the constitutional right of protection for farmers' property by facilitating whenever practicable the continued operation of existing agricultural enterprises, was thus antecedent to 1980; and it was the duty of defendants to be aware of the policies and provisions of the legislation governing the exercise of their FmHA functions.[16]

The case at bar thus seems to fall within the principle of *Fuentes a fortiori* since Arcoren was deprived not only of possession but of all property rights in his cattle. They were sold to a third party. Arcoren was summarily ejected from the cattle business as an independent entrepreneur. To be sure, he may have difficulty proving damages, for the sale price of the cattle was credited against his debt to FmHA. But there was a plain and total deprivation of property, amounting to a common law "trover and conversion" unless it was lawfully authorized.

The deprivation was of conventional property rights in his chattels (indeed the term chattels is derived from *catalla*, cattle, as the paradigmatic exemplification of personal property at common law). If prior notice is required for welfare "entitlements," the new-fangled type of property described by Professor Reich[17] (see *Goldberg, supra*), would it not be required *a fortiori* before permitting conversion of a type of personal property *par excellence* long recognized at common law? Is not the same *a fortiori* argument applicable to such property in cattle if prior notice is required of deprivation of another recently created type of protected interest in "good time credits" for prisoners (see *Hill, supra*)? A prisoner would not be treated unjustly if required to serve the entire prison term to which he was duly sentenced; his right to diminution of the time to be served is certainly not a constitutionally protected interest more solid and substantial than a traditional property right in cattle.

Without necessarily accepting appellant's characterization of FmHA loans as "predominantly a form of social welfare legislation,"[18] and hence governed by *Goldberg*, we think it is indisputable that the specific policies and procedures prescribed by the Congress with regard to such loans must be accepted and complied with by FmHA officials in performing their duties, and must be afforded due weight by the courts in evaluating the propriety of FmHA action and the legal consequences thereof.

---

**15.** *Lovelace v. Leechburg Area School Dist.,* 310 F.Supp. 579, 585 (W.D.Pa.1970).

**16.** Indeed, Section 126 of the Act (92 Stat. 429) declares that in carrying out the provisions of farm legislation the Secretary should ensure that "only officers and employees ... who are adequately prepared to understand the particular needs and problems of farmers in an area are assigned to such area."

**17.** Charles A. Reich, "The New Property," 73 Yale L.J. 733 (April, 1964).

**18.** 627 F.Supp. at 1518. See also *Coleman, supra,* 562 F.Supp. at 1364–65; and *U.S. v. Kimbell Foods, Inc.,* 440 U.S. 715, 735, 99 S.Ct. 1448, 1462, 59 L.Ed.2d 711 (1979).

We therefore conclude that Arcoren's implied *Bivens* right of action should not be cut off by summary judgment without an opportunity to present his case, although it seems likely that defendants may be able to show as a defense that under the circumstances they accorded him the functional equivalent of notice and hearing by reason of the prior course of dealing between the parties. Apparently, defendants said that if it had been anyone other than Arcoren, they would have called him in to discuss the problem.

This indicates that there may have been prior discussions with Arcoren regarding his delinquencies in caring for the cattle, in the course of which they may have definitely explained to him the consequences of continued disregard of his obligation to care properly for the cattle collateral, and he may have plainly indicated his inability or unwillingness to comply with his contractual obligations, even if further time were granted him for rectifying the default.

In the course of such prior dealings Arcoren may have acknowledged (or defendants validly determined) his incorrigible incompetence as a farmer, or that his nonperformance was not temporary or due to factors (such as weather or the depressed state of the farm economy in general) beyond his control.

In view of what may have taken place and been said on both sides on such prior occasions, defendants may have been justified in believing the statements of the third parties who notified them that Arcoren had abandoned the cattle.[19] Furthermore, as indicated above, Arcoren may have difficulty in establishing any actual damages.

Moreover, another factor weighing in defendants' favor when the reasonableness of their action is assessed under the standard of fundamental fairness is the need for quick action. In the case at bar livestock, needing constant care and feeding, were involved. The situation is different from a case involving tractors or other inanimate farm machinery or equipment.

Nevertheless, we are convinced that in view of the allegations showing prima facie deprivation of clearly established constitutionally protected rights of property without any notice or hearing, Arcoren should be permitted to prove his case if he can. Accordingly the judgment of the District Court is reversed and the case remanded for further proceedings in accordance with this opinion.

*Reversed and remanded.*

WOLLMAN, Circuit Judge, dissenting.

The majority opinion holds that the rights of an FmHA borrower, as enunciated by this court in *Allison v. Block*, 723 F.2d 631 (8th Cir.1983), were clearly established at the time defendants took possession of Arcoren's cattle in March of 1980. As I see it, such a holding is foreclosed by this court's recent decisions in *Hagemeier v. Block*, 806 F.2d 197 (8th Cir.1986); and *Culbreath v. Block*, 799 F.2d 1248 (8th Cir. 1986). Accordingly, I respectfully dissent.

---

**19.** The persons upon whose statements appellees relied were Richard Hand and appellant's uncle John Arcoren. Appellant's affidavit shows that he had made arrangements to use Hand's land, as well as land in which John Arcoren had an interest, to pasture the cattle. Appellees, by reason of familiarity with the pasturing arrangements may well have had reason to believe the statements on March 17, 1980 and March 25, 1980 by Hand and John Arcoren that they were taking care of the cattle and appellant was not, and that they "have had it" and will turn the cattle loose; and that they had placed the cattle "in a corral for FmHA to pick up." Appellees might even have had reason to believe that Hand and John Arcoren were authorized to act on behalf of appellant in making these statements.