Ed MUSHITZ, a/k/a Edwin T. Mushitz, and Mary Mushitz, a/k/a Mrs. Ed Mushitz, and Mary A. Mushitz, Riverview Ranch Living Trust, Patrick Mushitz, and Thomas Mushitz, Plaintiffs/Appellants,

v.

FIRST BANK OF SOUTH DAKOTA, N.A., a South Dakota Banking Corporation, Defendant/Appellant.

No. 16807.

Supreme Court of South Dakota.

Considered on Briefs Feb. 13, 1990.

Decided June 20, 1990.

---

Andrew B. Reid, Hot Springs, for plaintiffs/appellants.

F.M. Smith, Sioux Falls, for defendant/appellee.

WUEST, Chief Justice.

Ed Mushitz (Ed), and others, appeal from a circuit court order granting summary judgment to First Bank of South Dakota (Bank). We affirm in part and reverse and remand in part.

Ed and Mary Mushitz operate a 6,000 acre ranch and farm near New Underwood, South Dakota. The two purchased the ranch in 1969 and shortly thereafter Ed began to negotiate loans with Bank, the proceeds of which were used essentially to purchase livestock and farm machinery. The notes executed to the Bank by Ed were generally renewed every year and were secured by all of Ed's livestock and farm machinery. From 1969 through 1985, Ed paid and kept current at least the interest payments on the promissory notes and paid some of the principal when he was able. Every year, around March, Ed and the Bank would renew Ed's promissory notes. In March of 1985, Ed met with Bank representative Casey Hunter (Hunter) for the purpose of renewing his promissory notes. During his visit with Hunter, Ed was informed that his notes would be renewed but he would be required to sign an agreement authorizing the Bank's name to be put on all checks for the sale of any livestock, crops or machinery owned by Ed. Ed refused to sign the agreement, therefore, his notes were not renewed by the Bank.

On June 28, 1985, the Bank demanded payment of the principal on Ed's outstanding notes. The Bank asked Ed to enter into an agreement whereby Ed would bind himself to pay in full the principal on those notes by November 1, 1985. The Bank informed Ed that if he did not enter into this agreement, it would begin foreclosure proceedings in July of 1985. Ed refused to enter into any such agreement. As a result, the Bank initiated an action against Ed for the unpaid portion of the outstanding promissory notes. By this action, the Bank also requested possession of the loan collateral pursuant to our Replevin statutes set forth in SDCL ch. 21–15.[1] The record reflects the Replevin portion of this action was initiated by the Bank due to Ed's refusal to deliver the collateral to the Bank after his apparent default on the notes.

In compliance with our Replevin statutes, Ed was served with an order to show cause in the early part of August. By this order, Ed was requested to appear in court the following week to show cause why the Bank should not be given possession of the collateral in question. On August 16, 1985, the show cause hearing was held. Ed and his wife appeared at this hearing without an attorney. The attorney who was to represent them resided in North Dakota and was not licensed to practice law in this

---

1. SDCL ch. 21–15 is actually entitled "Claim and Delivery of Personal Property," but it is essentially a codification of the old Replevin remedy. *Willis v. DeWitt,* 3 S.D. 281, 52 N.W. 1090 (1892). Thus, we refer to these statutes as "Replevin" statutes.

State. This attorney had filed an answer to the Bank's complaint prior to the show cause hearing. This answer, however, was orally stricken by the trial court at the show cause hearing because it was signed by the unlicensed attorney. Having heard no objections from Ed at the hearing with respect to the Bank's request for possession of the loan collateral, the trial court then issued an order of immediate replevin of all Ed's livestock and farm machinery.

On August 19, 1985, a sheriff appeared at Ed's ranch and took possession of the livestock and farm machinery on the ranch. On August 22, 1985, the sheriff delivered the seized property to the Bank. Within two weeks from that date all of the livestock was sold by the Bank. Later, on November 4, 1985, the Bank filed a motion for default and requested that it be authorized to sell the machinery which it had earlier seized. The Bank did not provide any notice to Ed of this motion for default. Nevertheless, the trial court entered an order granting the motion on the same date. A certified copy of this order was mailed to Ed and Mary on November 5, 1985. One month later, the first sale of the machinery took place. The remaining machinery was sold on February 6, 1986, and on August 7, 1986. On February 17, 1989, the Bank made a motion for an order approving the accounting and for a deficiency judgment. At the present time, the Bank's motion is still pending in that action.

In August of 1987, Ed, along with his wife and two sons, instituted an action for damages against the Bank. In this action, Ed sought damages from the Bank for wrongful prejudgment taking. Ed also claimed that our Replevin statutes were unconstitutional. Further, Ed alleged that by selling the loan collateral prior to the rendition of a final judgment in the Bank's action on the notes, the Bank committed an act of conversion because the replevined property was to remain in the custody of the trial court until such a final judgment was rendered. As a result, Ed sought damages from the Bank for this alleged conversion. In addition to the conversion claim, Ed also claimed that the Bank breached an implied contract to forbear from suit when it instituted the first action against him. Finally, Ed asserted that the selling of the farm machinery and livestock was not done in a commercially reasonable manner.

After Ed filed his complaint asserting all of the aforementioned claims, the Bank filed an answer to this complaint and later submitted a motion for summary judgment. The trial court subsequently granted the Bank's motion for summary judgment. The trial court reasoned that the undisputed facts clearly showed the Bank complied with the requirements of our Replevin statutes. Hence, the trial court concluded no cause of action existed for wrongful prejudgment taking. With respect to Ed's claim of conversion, the trial court essentially determined that after the replevin order had been issued, the action in replevin had ceased and therefore the property was no longer in the custody of the court. Thus, the trial court concluded the Bank was free to dispose of it. As a result, the trial court concluded no cause of action existed as to conversion. The trial court further determined that Ed's breach of implied contract claim was a compulsory counterclaim which should have been alleged in the first action. The same conclusion was made with respect to Ed's claim relating to the constitutionality of our Replevin statutes. Lastly, the trial court determined that no genuine issue of material fact existed as to Ed's claim that the sale of the loan collateral was not done in a commercially reasonable manner. The trial court then determined that the facts presented showed the sale of the collateral was done in a commercially reasonable manner. Ed now appeals from this order of summary judgment. On appeal, Ed alleges the trial court erred in denying all of his aforementioned claims.

■ We first address Ed's argument that the trial court erred in granting Bank's motion for summary judgment regarding his claim of wrongful prejudgment taking. As noted previously, after Ed failed to pay the principal on certain outstanding promissory notes executed to the Bank, a Replevin action was instituted by

the Bank pursuant to SDCL ch. 21–15 for the purpose of gaining possession of Ed's livestock and farm machinery. According to SDCL 21–15–2:

> When an immediate delivery is claimed, an affidavit must be made by the plaintiff (Bank) or by someone on his behalf, stating:
>
> (1) that the plaintiff is the owner of the property claimed, particularly describing it, or is lawfully entitled to the possession thereof, by virtue of a special property therein, the facts in respect to which shall be set forth;
>
> (2) that the property is wrongfully detained by the defendant;
>
> (3) the alleged cause of the detention thereof, according to his best knowledge, information, and belief;
>
> (4) that the same has not been taken for a tax, assessment, or fine, pursuant to a statute, or seized under an execution or attachment against the property of the plaintiff, or, if so seized, that it is, by statute, exempt from such seizure;
>
> (5) the actual value of the property.

Ed alleges that the Bank failed to satisfy the requirements of this statute in several respects. We address them individually.

■ Ed first alleges the Bank failed to establish that it had a property interest in his livestock and farm machinery. We find no merit in this argument. In the Bank's affidavit presented to the trial court pursuant to the above-statute, it is specifically stated that Ed was in default on a number of notes executed in favor of the Bank. It is further provided in this affidavit that the Bank and Ed had entered into a security agreement whereby the two parties agreed that if Ed defaulted on those promissory notes, then the Bank was entitled to take possession of the loan collateral. This allegation was supported by the security agreement which was presented to the trial court along with the Bank's affidavit. These facts alleged in the affidavit, together with the documents supporting these allegations, clearly establish that the Bank did have a special property interest in the loan collateral.

■ Next, Ed contends that the Bank's description of the collateral in its affidavit was deficient in that such collateral was not particularly described. In a related argument, Ed contends that the trial court's subsequent adoption of the language describing the collateral in its order of replevin was erroneous. The collateral in question was described in the affidavit and replevin order as follows:

> All farm machinery and equipment of every kind and description now owned and hereafter acquired ... and all livestock of every kind and description now owned and hereafter acquired, together with the young and produce thereof, and all other livestock and poultry now owned or hereafter at any time acquired by [him] or in which [he] obtained rights.

While we do not consider this to be a model description of property to be replevined, we do believe it is sufficient in this case to meet the requirements of SDCL ch. 21–15.

In *Kierbow v. Young*, 20 S.D. 414, 107 N.W. 371 (1906), this Court addressed the degree of particularity that is needed with respect to descriptions of collateral in replevin actions. In addressing this topic, this Court stated:

> It is essential in [a replevin] action that the property sought to be recovered be sufficiently described so that it can be identified by the officer serving the process, and a sufficient description given to enable the defendant to know what property he is charged with detaining, in order that he may prepare his defense to the action ... [I]t must be described with a reasonable degree of certainty, sufficiently definite to enable the property to be positively identified.

*Kierbow, supra,* 20 S.D. at 417, 418, 107 N.W. at 373. The description of "all farm machinery ... and livestock owned by Ed" was clearly sufficient to enable Ed to know what property he was charged with detaining. The collateral was also sufficiently described so that it could be identified by the officer serving the process. In *Kierbow*, we held that "goods, wares and merchandise" was an insufficient description of

property to be replevined. The terms in that description are inherently vague and indefinite. An officer serving process in a replevin action may not know what type of property may be classified as a "good" or a "ware." We do not believe that such uncertainty arises where the description refers to "farm machinery and livestock" owned by a certain individual. While it may have been helpful for the replevin order to state where the property was located, the failure of the replevin order to do so in this case is irrelevant since the officer serving the process seized the loan collateral at Ed's ranch where the property clearly was located.

As a final matter with respect to this issue, we note that insofar as descriptions of collateral in security agreements are concerned, many courts have upheld descriptions referring to "all farm machinery and farm products," stating that such descriptions reasonably identify what they describe. *See e.g. United Bank of Bismarck v. Selland*, 425 N.W.2d 921 (N.D.1988) ["all equipment, machinery & farm products"]; *United States v. First Nat. Bank in Ogallala, Neb.*, 470 F.2d 944 (8th Cir.1973) ["All farm and other equipment ... now owned or hereafter acquired by the debtor ..."]. As replevin actions are often instituted by secured creditors so they may gain possession of the loan collateral described in their security agreements, we believe the above-mentioned authorities further support our conclusion that the description of the property in the present case is sufficient to meet the standards for such descriptions as set forth in our Replevin statutes and in case law. For the foregoing reasons then, we conclude Ed failed to establish a cause of action for wrongful prejudgment taking based upon the alleged failure to particularly describe the collateral in the affidavit and replevin order. Therefore, the trial court did not err in granting summary judgment to the Bank on this issue.

■ Ed next contends the Bank failed to establish a wrongful detention of the property. We disagree. In the affidavit presented to the trial court by Bank representative Hunter, it is declared that pursu-

ant to the security agreement entered into between the Bank and Ed, the Bank was entitled to possession of the collateral upon default of Ed. Hunter also indicated in this affidavit Ed was in default on a number of promissory notes and he was thereafter requested to turn over the collateral to the Bank, but refused to do so. These facts alleged by the Bank and supported by documents accompanying the affidavit sufficiently establish Ed was wrongfully detaining the loan collateral. Therefore, we find no error with respect to this issue.

■ Lastly, Ed submits the Bank failed to establish the actual value of the collateral seized. We disagree. In addressing this issue, it is significant to note that before possession of property may be taken under our Replevin statutes, a bond must be posted in double the value of the property as set forth in the affidavit. *See* SDCL 21–15–4. This, of course, is designed to protect the interests of the person against whom the property is being taken. The fact that the bond must be posted in twice the amount of the property's estimated value clearly indicates the estimated value of the property need not be precise. In the present case, two affidavits were presented to the trial court which specifically estimated the value of the property to be $185,000. One of these affidavits was made by the attorney for the Bank, and the other was made by Bank representative Hunter. The record reflects that the value of the property set forth in both affidavits was based upon the familiarity of Bank officials with the collateral through contact with such collateral on various occasions. Additionally, we note that Ed did not dispute the Bank's estimated value of the loan collateral at any time during the Replevin action, nor does he dispute this amount on appeal. For all of the foregoing reasons, we conclude that Ed failed to establish a cause of action for wrongful prejudgment taking based upon the Bank's alleged failure to establish the actual value of the replevined property. Hence, we hold the trial court did not err in granting summary judgment on this issue. Furthermore, as the undisputed facts in this case reflect that the Bank sufficiently complied with all of the

requirements of SDCL 21–15–2, we conclude the trial court was correct in determining that Ed failed to establish a claim of wrongful prejudgment taking on the basis of failure to comply with SDCL 21–15–2.

■ In addition to alleging that the Bank's prejudgment taking was wrongful due to its failure to comply with SDCL 21–15–2, Ed also submits that the prejudgment taking was wrongful due to certain misconduct of the sheriff. In particular, Ed alleges that the sheriff failed to hold the seized collateral for at least three full days as required by SDCL 21–15–14.[2] Ed also claims that the sheriff failed to file his report and papers regarding the seizure within the twenty-day filing period provided by SDCL 21–15–16.[3] With respect to this argument we note the language of SDCL 21–15–16, which provides:

> The failure or neglect of the sheriff to make such verified report of his proceedings and file the same in the office of the clerk with the other documents above specified in the manner and within the time above required *shall not however void his proceedings under the affidavit and endorsement but shall render him liable to punishment by the Court as for contempt and liable by amercement or civil action to any person thereby injured* in like manner as is provided with reference to writs, warrants and executions by [SDCL] 15–18–44.

This statute evidences a legislative intent that the sheriff should be liable to punishment by the trial court or liable to any injured party as a result of his failure to abide by the rules set forth in our Replevin statutes. Hence, if a cause of action does exist for the sheriff's failure to comply with the rules set forth in SDCL ch. 21–15, such cause of action lies against the sheriff, not against the person to whom the property was delivered. Furthermore, in accordance with the rule set forth in the above-cited statute, we conclude that the sheriff's failure to properly execute his duties under SDCL ch. 21–15 does not void his proceedings. For these reasons, we hold that the trial court did not err in granting Bank's summary judgment with respect to this matter.

■ We next direct our attention to Ed's argument that the trial court erred in granting the Bank's motion for summary judgment with respect to Ed's claim of conversion. Ed argues that the Bank is liable to him for selling the loan collateral prior to the rendition of a final judgment in the Bank's action against Ed. Ed reasons that this property was in the constructive custody of the court until a final judgment in the action was rendered, and that by selling the property while it was in the constructive custody of the court, the Bank committed an act of conversion. Thus, according to Ed, the Bank is liable to him for committing this act of conversion. In support of this argument, Ed cites *Roberts v. Mooney*, 65 S.D. 287, 273 N.W. 378 (1937). In *Roberts*, we stated:

> [Specific property taken in replevin is in the . . .] constructive custody of the court for delivery to the prevailing litigant in accordance with the terms of the judgment ultimately rendered in the action. The possession thus permitted is temporary in character.

*Roberts, supra,* 65 S.D. at 290, 273 N.W. at 380. Based upon our research of the legal issue presented here, we hold that the above noted statement in *Roberts* does not create a cause of action for conversion under the facts of this case.

Conversion of property in the custody of the court has commonly been referred to as

---

**2.** SDCL 21–15–14 provides:

If a return of the property be not required pursuant to [SDCL] 21–15–12 within three days after the taking and service of papers on defendant, it shall be delivered to the plaintiff unless claimed in the meantime by a third person in the manner provided by this chapter.

**3.** SDCL 21–15–16 provides in pertinent part:

Within twenty days after taking the property, the sheriff shall make a verified report of his proceedings in taking and disposing of it, and file the same together with the original affidavit, order authorizing delivery, undertaking, or receipt, and a copy of his notice of levy, with the clerk of the court in which the action is pending.

"conversion, custodia, legis." In 1970, the Tenth Circuit Court of Appeals determined that a debtor could not maintain an action based upon conversion, custodia legis in Oklahoma because Oklahoma had enacted the Uniform Commercial Code (U.C.C.). *See, Brunswick Corp. v. J. & P., Inc.,* 424 F.2d 100, 7 U.C.C.Rep.Serv. 643 (10th Cir. 1970). The Court reasoned that the U.C.C. is incompatible with the principle of conversion, custodia legis because "the policy of the U.C.C. is to provide flexibility in the disposition of the collateral, including the timing of the sale, to produce the maximum amount from the sale of the collateral." *Brunswick, supra,* 424 F.2d at 105. Additionally, the Court stated that the U.C.C. sufficiently protects the interests of the debtor by allowing the debtor to question the "commercial reasonableness" of the loan collateral sale, and also by providing a pre-sale remedy to the debtor for restraining a creditor who in any fashion is not proceeding in accordance with the default provisions of the U.C.C. *Id.* We find the reasoning set forth in *Brunswick* to be persuasive on the present issue since the U.C.C. has also been enacted in this State. Hence, we conclude that the trial court did not err in determining that Ed was not entitled to damages from the Bank merely because the Bank sold the replevined property prior to the rendition of a final judgment in the Bank's action on the notes. As *Roberts* was decided by this Court years before this State's enactment of the U.C.C., we decline to apply the principles set forth in that case relating to the trial court's constructive custody of replevined property, at least insofar as claims under the U.C.C. are concerned.

■ As a final matter with respect to this issue, we note that an action in replevin only determines possessory rights. It does not determine ownership rights. Therefore, if the secured creditor sells the replevined property prior to a final judgment, he does so at his own risk and under a claim of ownership derived from some other source. In the event the secured creditor is not successful in obtaining a final judgment granting him ownership rights in the replevined property, he and his sureties are liable to the debtor for the value of the property and for damages if the creditor does not have the property to return. *See, Sedalia Mer. Bank & Tr. v. Loges Farms,* 740 S.W.2d 188 (Mo.App. 1987).

■ We now direct our attention to Ed's argument that the trial court erred in dismissing as compulsory counterclaims Ed's claim of breach of implied contract and his claim challenging the constitutionality of our Replevin statutes. With respect to this issue, Ed contends that the trial court's oral order striking his answer was ineffective under SDCL 15–6–58 because it was not reduced to writing and filed in the trial court's office.[4] He further submits that the trial court's order of default was also ineffective since he was not provided with notice of the motion for default by the Bank pursuant to SDCL 15–6–55(b).[5] As a result of these errors, Ed claims that the time for him to replead in response to the replevin complaint never began to run and will not run until the order striking his answer is entered. Therefore, according to Ed's reasoning, since Ed may still assert the above-mentioned counterclaims in the original action by repleading in that action, then his counterclaims should not have been barred by the compulsory counterclaim rule in the second action. For the reasons hereafter described, we conclude that this argument lacks merit and hold that the trial court did not err in dismissing the above-mentioned counterclaims under our compulsory counterclaim statute.

---

**4.** SDCL 15–6–58 provides in pertinent part:

A judgment or an order becomes complete and effective when reduced to writing, signed by the court or judge, attested by the clerk and filed in his office.

**5.** SDCL 15–6–55(b) provides in pertinent part:

Judgment by default may be entered as follows: (1) By the court ... if the party against whom judgment by default is sought has appeared in the action, he shall be served with written notice of the application or judgment at least three days prior to the hearing on such application.

■ Initially, we agree that the trial court's order striking Ed's answer was ineffective because, pursuant to SDCL 15–6–58, an order becomes effective when reduced to writing, signed by the court or judge, attested by the clerk and filed in his office. This was not done in the present case, therefore, it follows that the order striking the answer is not effective. Hence, the answer still stands. We also agree that the judgment of default is ineffective because Ed did appear in this Replevin action, and hence he should have been served with written notice of the application for a default judgment at least three days prior to the hearing on such application. *See,* SDCL 15–6–55(b); *See also, National Surety Corp. v. Shoemaker,* 86 S.D. 302, 195 N.W.2d 134 (1972). Ed was not provided with any such notice, therefore, the default judgment rendered against him is invalid. The result under these circumstances then is that Ed's answer is still valid and a final determination of the matter in the first action is necessary since the default judgment is invalid. This, however, does not mean that Ed's claim of breach of implied contract and his claim challenging the constitutionality of our Replevin statutes are not compulsory counterclaims.

Our statute which sets forth the compulsory counterclaim rule is SDCL 15–6–13(a). The statute provides in pertinent part:

A pleading shall state as a counterclaim any claim which at the time of serving the pleading the pleader has against any opposing party, if it arises out of the transaction or occurrence that is the subject matter of the opposing party's claim . . .

Ed's answer to the Bank's complaint in the original action did not assert a claim of breach of implied contract to forbear from suit, nor did it assert a claim charging that our Replevin statutes are unconstitutional. These are counterclaims which Ed could have clearly pleaded at the time he served his answer. Furthermore, these claims both arise out of the occurrence that was the subject matter of the Bank's complaint, to wit: Ed's failure to pay the principal on the overdue notes and his failure to turn over possession of the loan collateral to the Bank after his apparent default. It is clear, therefore, that Ed's aforementioned claims are compulsory counterclaims as defined by SDCL 15–6–13(a). The fact that Ed may replead his answer in the original action to include these counterclaims does not mean that he is free to raise these claims in a separate action. The simple fact remains that the pleading in the original action should have included these claims. To date, they have not been included in Ed's answer by amendment or otherwise. Whether Ed may amend his pleading in the original action to include these counterclaims is, of course, in the discretion of the trial court in that action. *See,* SDCL 15–6–15(a). For the foregoing reasons, then, we conclude the trial court did not err in dismissing as compulsory counterclaims Ed's claim of breach of implied contract and his claim challenging the constitutionality of our Replevin statutes.

■ Ed's final argument on appeal is that the trial court erred in granting summary judgment with respect to his claim that the sale of his farm machinery and livestock was not conducted in a commercially reasonable fashion. In addressing this issue, we first note our standard of review insofar as summary judgments are concerned. In reviewing a grant or denial of summary judgment under SDCL 15–6–56(c), we must determine whether the moving party demonstrated the absence of any genuine issue of material fact and showed entitlement to judgment on the merits as matter of law. *Pickering v. Pickering,* 434 N.W.2d 758, 760 (S.D.1989). The evidence must be viewed most favorably to the non-moving party and reasonable doubts should be resolved against the moving party. *Id.* The non-moving party, however, must present specific facts showing that a genuine, material issue for trial exists. *Id.* Having reviewed the evidence in this case in a light most favorable to Ed, we conclude the trial court erred in finding that no genuine issues of material fact were shown concerning the commercial reasonableness of the livestock and farm machinery sale.

In holding that the sale of the livestock was done in a commercially reasonable manner, the trial court placed much significance on the fact that the cattle and pigs were sold almost immediately, and that they were kept at recognized livestock sale barns. From the record, however, it appears that the livestock was only kept at recognized sale barns at the time of the sale. According to the testimony of two Bank representatives, for some period prior to the time of the sale, the livestock was kept at the farms of certain individuals, and not at recognized sale barns. Additionally, the record reflects that the majority of the livestock taken by the Bank was sold eight or nine days after the taking. This may have been a sufficient period of time for the livestock to deteriorate, suffer weight loss, be exposed to disease and suffer from lack of water at the time of sale. In fact, it was the testimony of Bank officer Hunter that many of the pigs were suffering from "Rhino and Mange," otherwise known as "bullnose," at the time of the sale. The record reflects that these pigs had to be sold at two barns because the first barn would not take the diseased pigs. Furthermore, Hunter also testified that he did not recall if any of the pigs were diseased when they were taken. According to an affidavit presented by Ed, his pigs had never developed "bullnose." Ed further declared that the place where the pigs were kept by the Bank was contaminated with "bullnose."

Other allegations were also made by Ed which dispute the contention that the sale of the livestock and the farm machinery was done in a commercially reasonable manner. In an affidavit presented to the trial court, Ed declared that it was his personal knowledge that the cattle which had been seized by the Bank had suffered a weight loss between the time of the taking and the time of the sale. Ed determined this based upon his personal knowledge of the weights of the cattle at the time of the taking, and those weights shown on the livestock sales receipts which were made at the time of the sale. Furthermore, in his affidavit, Ed described his knowledge of farm machinery values and markets. He further described the special characteristics and value of the machinery taken. Based upon this knowledge, Ed declared that the farm machinery was sold at an inadequate price. These allegations made by Ed are not without merit and are deserving of consideration. There was a genuine issue of material fact concerning the commercial reasonableness of the livestock and farm machinery sales. Hence, we conclude the trial court erred in granting the Bank's motion for summary judgment with respect to this issue.

In accordance with the reasoning set forth in this opinion, we affirm the trial court's granting of summary judgment in all respects, except as to the issue of whether the sale of Ed's livestock and farm machinery was done in a commercially reasonable fashion. Therefore, we remand this case for further consideration upon this issue and recommend this action be consolidated for trial with the original action instituted by the Bank.

Judgment affirmed in part and reversed and remanded in part.

HENDERSON, SABERS and MILLER, JJ., concur.

MORGAN, J., specially concurs.

MORGAN, Justice (specially concurring).

I concur generally with the majority disposition of the issues on wrongful prejudgment taking, conversion, and dismissal of compulsory counterclaims. However, I write to concur specially on the issue of the commercial reasonableness of Bank's sale of the Mushitz livestock and machinery.

First, we are reminded that summary judgment is a proper remedy only when there are no material factual disputes. *Klatt v. Continental Ins. Co.*, 409 N.W.2d 366, 368 (S.D.1987); SDCL 15-6-56(c). The burden is on the moving party to clearly show that there are no genuine issues of material fact, and the evidence must be viewed most favorably to the nonmoving party, resolving all reasonable doubts against the moving party. *Id.* Assuming

a prima facie showing has been made, the nonmoving party must respond by presenting specific facts which demonstrate a genuine, material issue for trial. *Laber v. Koch*, 383 N.W.2d 490, 492 (S.D.1986).

The substantive issues revolve around the question of compliance with the provisions of the Uniform Commercial Code (U.C.C.), particularly with SDCL 57A-9-504(3) and 57A-9-507(1). As pertinent to the collateral herein involved, two parts of the U.C.C. are applicable. 57A-9-504(3) provides:

> Disposition of the collateral may be by public or private proceedings and may be made by way of one or more contracts. Sale or other disposition may be as a unit or in parcels and at any time and place and on any terms but every aspect of the disposition including the method, manner, time, place and terms must be commercially reasonable. Unless collateral is ... of a type customarily sold on a recognized market, reasonable notification of the time and place of any public sale or reasonable notification of the time after which any private sale or other intended disposition is to be made shall be sent by the secured party to the debtor if he has not signed after default a statement renouncing or modifying his right to notification of sale.

97A-9-507(1) also provides, in pertinent part:

> If the disposition has occurred the debtor or any person entitled to notification ... has a right to recover from the secured party any loss caused by a failure to comply with the provisions of this part.

As we pointed out in *First Bank of South Dakota v. VonEye*, 425 N.W.2d 630, 636 (S.D.1988), "[c]ommercial reasonableness of the sale of collateral is a question of fact." Citing from *First Bank v. Haberer Dairy & Farm Equip.*, 412 N.W.2d 866, 871 (S.D.1987), we reiterated:

> "... 'it is the aggregate of the circumstances in each case—rather than specific details of the sale taken in isolation—that should be emphasized in a review of the sale. The facets of manner, method, time, place, and terms cited by the Code

are to be viewed as necessary, and interrelated parts of the whole transaction.'" (Citations omitted.)

With these admonitions in mind, I will proceed to examine the dispositions with respect to the two categories of collateral: livestock and farm machinery.

First, with respect to the sale of the livestock, the trial court made the following pertinent findings and conclusions in its memorandum opinion which it incorporated in its order for summary judgment:

> The cattle and hogs were sold almost immediately by the Bank at recognized local livestock auction markets.
> No notice was given to Plaintiffs prior to the livestock sales.
> Plaintiffs were not entitled to notice prior to the sale of the livestock on recognized livestock auction markets. *First Nat'l Bank v. Kehn Ranch, Inc.*, 394 N.W.2d 709 (S.D.1986); SDCL 57A-9-504(3).
> The parties differ on the exact number of cattle seized by the sheriff.
> [Plaintiffs] assert that the property was not well cared for, and was allowed to deteriorate....
> Plaintiffs fail to establish specific facts supporting these contentions.
> Bank has presented evidence that the livestock were kept at recognized livestock exchange barns and pens, were fed and were treated by veterinarians prior to sale. Plaintiffs offer no substantial evidence suggesting this is not appropriate care. Failure to do so is a failure of Plaintiffs to carry their burden of demonstrating a genuine material fact dispute on this issue. *Laber v. Koch, supra.*

With respect to the trial court's finding that plaintiffs failed to raise an issue of fact on the care afforded the cattle, I disagree. As I review the record, I find therein an affidavit of Ed Mushitz, in response to Bank's motion for summary judgment, wherein it is specifically set out, in pertinent part:

> At that time [the August 19, 1985 taking by the sheriff] the livestock was in top condition, some of the best in the county. The cows had and (sic) average weight of

about 1150 lbs., the calves averaged about 300 lbs., the hogs and weiners (sic) weighed an average of about 125 lbs., and the sows weighted (sic) about 250 lbs. on the average.... I am further personally aware that the cows were left without water for an extended period and were in a very poor condition when they reached the sale barn and that both the cattle and the hogs had lost weight since they were taken from me, and that they were sold in the poor condition. I am also personally aware that the hogs prior to the sale were kept in a place contaminated with bullnose, an affliction that we have not had and that the hogs did not have when they were taken from me, and that they developed bullnose and were sold in that condition.... Bullnose will cause a $100–150 drop in the price of anything but butcher hogs and a drop in value of about 10 to 15 percent in butcher hogs. It is my opinion that the cows had lost about 100 to 150 lbs each between the time of taking and the time of sale and that the calves had lost between 50 and 75 lbs each during that period....

It is difficult for me to conceive what more Mushitz could have done to raise the material issue of fact that the cattle were not properly handled between the time of taking and the sale. Indeed, the 153 head discrepancy in the number of cattle *noted by the trial court* (Mushitz' claim of 535 head as opposed to Bank's accounting for 382 head) creates a dispute of fact. On that basis alone, I would suggest that the grant of summary judgment was improper.

Further, the trial court found that Mushitz received no notice of the sale of the livestock, but concluded that such notice was not necessary because the livestock was sold on recognized livestock auction markets, relying on this court's decision in *Kehn Ranch*. The U.C.C., at 57A–9–504(3) as set out above, mandates notice to the debtor of the time and place of sale of the collateral *unless* it falls within certain categories including, as pertinent to this case, goods customarily sold on a recognized market. In *Kehn Ranch*, the majority extended the definition of collateral "of a type customarily sold on a recognized mar-

ket" to include cattle sold at livestock auction sales. This monumental leap of logic came about thusly:

Admittedly, the cattle market is not identical to the New York Stock Exchange or the bond markets. But like the stock exchange, prices paid for cattle are available by quotation on a daily basis, as are prices paid for shares on the NYSE. Furthermore, when the Bank took possession of the security, cattle were being traded daily on the commodity futures markets, similar to grain and other commodities. Under such a marketing system there is no room for bidding on individual cattle, and "[t]he forces of supply and demand determine price and the valuation of goods...." (Citation omitted.) To claim otherwise would seemingly deny the obvious. We accordingly conclude that commercial cattle herds raised for sale at public livestock markets are collateral 'of a type customarily sold on a recognized market' for purposes of SDCL 57A–9–504(3).

394 N.W.2d at 715 (footnote omitted).

The purpose of adoption of any uniform code is to have some uniformity of law among the various "code" states. The *Kehn Ranch* decision puts South Dakota in a class by itself. Admittedly there was not a lot of authority on the issue. At the time, there were two clear cut decisions contra to *Kehn Ranch* which the majority rejected: *Wippert v. Blackfeet Tribe,* 215 Mont. 85, 695 P.2d 461, 464 (1985), and *State Bank of Towner v. Hansen,* 302 N.W.2d 760, 765 (N.D.1981). The majority chose to follow a federal district court opinion which likewise had rejected the Montana and North Dakota cases, but for a reason totally unrelated to the issue in *Kehn Ranch. Arcoren v. Peters,* 627 F.Supp. 1513 (D.S.D.1986), *rev'd,* 811 F.2d 392 (8th Cir.), *aff'd on rehearing en banc,* 829 F.2d 671 (8th Cir.1987), *cert. denied,* 485 U.S. 987, 108 S.Ct. 1290, 99 L.Ed.2d 500 (1988), concerned whether two FmHA officials enjoyed qualified immunity from suit for damages for selling cattle repossessed under a security agreement without complying with the notice requirements of

57A–9–504(3). The issue was whether the officials had violated plaintiff's "clearly established" statutory rights so as to deprive them of immunity.

The reason that the federal district court judge gave for rejecting *Wippert* and *Hansen* was that they had been decided *after* the sale in *Arcoren* and thus did not clearly establish applicable law *at the time of the sale.* 627 F.Supp. at 1519. *Arcoren* was totally devoid of any discussion on the merits of the issue on what constitutes collateral customarily sold on a recognized market. *See Kehn Ranch,* 394 N.W.2d at 721 (Morgan, J., dissenting) for further discussion of this issue.

Second, in regard to the sale of the farm machinery, the trial court found that the farm machinery was sold pursuant to a court order dated November 4, 1985. The record discloses that the court order provides that the machinery described therein should be sold in a commercially reasonable manner under the U.C.C. The memorandum opinion then found that some of the machinery was sold the following month and the balance in the following spring. Further, the trial court also found that the sale was advertised in a local trade journal with wide circulation and was accomplished by the taking of bids. The only notice to Mushitz acknowledged in the memorandum was that provided by the court's November order.

Mushitz' affidavit alleges the value of certain items of the machinery at the time of the taking:

Case tractor—$16,000
Farmall M tractor—$1,500
Farmall H tractor—$800
16 foot grain drill—$3,500
18 foot tandem disc—$700

The affidavit goes on to conclude that the value that Bank received for the sale of the equipment was not commercially reasonable and did not reflect the value of the property at the time that it was taken. While this record does include some reports of the livestock sale, there is no showing of the report of sale of the machinery. We are unable therefore to compare the returns. The trial court's memorandum went on to conclude that the commercial reasonableness of the sales was established in tune with our decisions in *Haberer, supra,* and *VonEye, supra.*

I do not agree with that conclusion. There was no issue in *VonEye* as to notice of sale. In *Haberer,* we discussed the requirement for notice of private sale:

> [A] creditor intending to sell collateral at private sale must send *"reasonable notification* [to the debtor] of the time after which any private sale ... is to be made...."* (Citation omitted.) The term "reasonable notification" is not defined in the Code, but "courts have consistently treated the uniform commercial code requirement of *reasonable notification* as a question of fact to be determined only after considering all the facts and circumstances of the individual case." (Citations omitted.)

412 N.W.2d at 873 (emphasis in original).

In this case, Mushitz received no notification from Bank as to the time at which the private sale was to be held except, perhaps, if he happened to pick up the trade journal wherein there was an advertisement. There was nothing in the order for sale that gave him any notice of the time or place or manner of sale, except that it was to be commercially reasonable. Again, as we said in *Haberer,* "the real issue in these cases is not whether a debtor received notice, but if a creditor, in view of all the facts and circumstances of each case, took reasonable steps to give notice to the debtor." *Id.* at 872. It does not appear to me that this has been done, but at the least it is a question of material fact that is in dispute.

I would therefore reverse and remand the issue of commercial reasonableness of the sale of both livestock and machinery for jury trial.