#23560-a-JKK
**2006 SD 76**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

\* \* \* \*

THE PEOPLE OF THE STATE
OF SOUTH DAKOTA IN THE
INTEREST OF L.S., C.S., AND J.S.          Children and concerning

S.O.B.,                                   Appellant,

and

J.S. AND S.C.,                            Respondents.

\* \* \* \*

APPEAL FROM THE CIRCUIT COURT OF
THE SECOND JUDICIAL CIRCUIT
MINNEHAHA COUNTY, SOUTH DAKOTA

\* \* \* \*

HONORABLE PETER H. LIEBERMAN
Judge

\* \* \* \*

LAWRENCE E. LONG
Attorney General

BRENT KEMPEMA
Assistant Attorney General
Department of Social Services
Pierre, South Dakota          Attorneys for appellee State.

STEVEN R. BINGER
Binger Law Office
Sioux Falls, South Dakota      Attorney for appellant Mother.

\* \* \* \*

ARGUED ON NOVEMBER 9, 2005
REASSIGNED APRIL 17, 2006

OPINION FILED **08/16/06**

#23560

KONENKAMP, Justice (on reassignment).

[¶1.]        In this abuse and neglect action, the mother appeals the judgment terminating her parental rights. She contends that the State's failure to proceed with a new allegation during a previous abuse and neglect proceeding makes the issue res judicata. We affirm.

## Background

[¶2.]        In 2001, L.S., age twelve at the time, told her mother, S.O., that T.O. had exposed his penis to her and asked her to touch it. T.O. was the mother's boyfriend. She relied on him to provide care for L.S. and her two other daughters, C.S. and J.S. When the mother asked T.O. about this incident, he acknowledged that it did happen. The mother, nevertheless, continued to date T.O. and use him as a caregiver for her three daughters. Then in March 2002, J.S., age nine, told her mother that T.O. "was moving up and down" while she was sitting on his lap. C.S. also informed her mother about an incident with T.O.: he had asked her to "rub lower" while she was rubbing his stomach.

[¶3.]        After these latter incidents with J.S. and C.S., the mother contacted law enforcement. In turn, the Department of Social Services (DSS) was notified and a social worker told the mother that T.O. should have no contact with her children. She kicked T.O. out of her home. Thereafter, DSS closed its file. However, in May 2002, DSS received word that the mother married T.O. and continued to use him as a caregiver. After confirming this information, DSS removed the children from the mother's custody and filed an abuse and neglect petition against her.

[¶4.] In the meantime, based on the incidents with the girls in March 2002, T.O. was indicted in Lincoln County with two counts of sexual contact with a child under sixteen. On September 19, 2002, T.O. pleaded nolo contendre to felony child abuse and received a suspended penitentiary sentence, 180 days in jail, and work release. His five year probation included a condition that he have no contact with L.S., C.S., and J.S.

[¶5.] In September 2002, an adjudicatory hearing was held on the abuse and neglect petition. At the hearing, the mother admitted that T.O. had touched her children, but she claimed that it was not sexual. The circuit court concluded by clear and convincing evidence that the allegations in the petition had been proved. The court found that the mother knew of T.O.'s sexual contact with her children and she nevertheless "used poor judgment" and continued to use "him as a primary daycare provider." This, according to the court, "allowed [T.O.] the opportunity to prey upon her two other children." The court also recognized that the mother married T.O. after DSS closed its initial file. Therefore, the court declared that it would be "contrary to the minor children's welfare to be immediately returned to their parents' custody." The children were adjudicated abused and neglected by an order dated November 4, 2002.

[¶6.] While the children remained in protective custody, DSS prepared multiple case plans for the mother. She was required to obtain suitable housing, maintain her employment, complete parenting classes, complete a psychological evaluation, attend weekly visitations with her children, and provide a safe and secure environment for them. She was to cease her contact with T.O., not speak of

him to her children, and not allow T.O. to have contact with them. She was also told to obtain a divorce from T.O. In a subsequent case plan, DSS added a requirement that the mother attend anger management classes.

[¶7.]	In partial compliance, the mother completed parenting classes, the psychological evaluation, and attended regular visitation with her children. However, she failed to get the counseling recommended in her psychological evaluation. She did not divorce T.O. Instead, she remained in contact with him and continued to speak of him to the children during her scheduled visitations. While DSS learned through the children that the mother attended an anger management class, it was not aware that she had completed that requirement of her case plan.

[¶8.]	Believing that the mother would continue to expose her children to harm, the State moved to terminate the mother's parental rights in May 2003. Before a dispositional hearing was held, the State also requested a protection order prohibiting the mother from having any contact with the children because her defiance toward DSS was destructive to her children. The circuit court agreed, stating "I thought it would be in the best interests of these girls to continue to have a relationship with their mother. After what I've heard today, I no longer feel that way. . . . I agree that they need a stable, consistent environment, and that all the mother has done is continued to disrupt that." The court granted the State's motion for a protective order.

[¶9.]	In response, the mother began cooperating with DSS. She completed her case plan requirements and filed for a divorce from T.O. A dispositional hearing

was ultimately conducted in December 2003. DSS testified that the mother had in fact completed all that had been requested of her. DSS still believed, however, that her parental rights should be terminated. At the hearing, a representative from DSS testified, "[m]y biggest concern is that [the mother] doesn't seem to grasp the seriousness of what happened, and I also believe that her children also have this belief, that what happened isn't serious. So whether it's [T.O.] or somebody else, that is my—that's my biggest concern. She doesn't appear to get it."

[¶10.]     At the completion of the dispositional hearing on January 30, 2004, the mother moved to dismiss the case. Circuit Judge Kathleen K. Caldwell orally granted the mother's motion. The court stated that "the last time we were here also we heard that [the mother] had been divorced from [T.O.] and done parenting classes and done everything that [DSS] had asked her to do. And I just think that there is not enough evidence in this case to terminate anyone's rights." After ordering that the case be dismissed, the court accepted the recommendation from the [parents'] attorneys that entry of the order be delayed for thirty days. The delay was requested so the mother and the two fathers could resolve custody issues among themselves. Judge Caldwell warned, "basically once the thirty days are over, I'm going to dismiss this case, and things will go back to the way they were prior to this case being filed absent any other orders being entered."

[¶11.]     After the January 30 hearing, but before a written order was entered, DSS hired an investigator to follow the mother because it believed that she was continuing to have contact with T.O. At this time, he was still incarcerated, but would leave at 10:30 p.m. on work release to be at John Morrell by 11:00. Just as

DSS had suspected, the investigator observed the mother meet with T.O. outside Morrell's on three consecutive nights: February 10, 11, and 12, 2004. On February 12, in particular, the mother brought J.S. and another child with her. At this meeting, the investigator observed T.O. get into the mother's vehicle while the two children were in the backseat.[1] When questioned about exposing her child to T.O., the mother initially denied that it happened, but then claimed that they met to discuss health insurance matters, because they were still married at the time.

[¶12.] Believing that returning the children to the mother would place them in imminent risk of harm, the State filed a motion on February 24, 2004, requesting that Judge Caldwell reconsider her January 30 order dismissing the petition. The State also requested that a hearing be scheduled on the motion. The State's motion set forth the facts surrounding the February 12 incident and included an affidavit from William Golden, the children's attorney, attesting to the same. After receiving this motion, Judge Caldwell did not schedule a hearing, but instead telephoned Thomas Wollman, the Lincoln County State's Attorney. Wollman later testified that Judge Caldwell would not entertain the motion because she believed that filing a new petition was the way to proceed. In accord with her oral order, therefore, Judge Caldwell signed the written order dismissing the case on March 1, 2004.

[¶13.] Two days later, the State filed a second abuse and neglect petition, this time in Minnehaha County. This petition, like the previous one, alleged that the mother had failed to protect her children. With the factual background from the

---

1. A court later found that T.O. violated the conditions of his suspended sentence and he was scheduled for resentencing.

previous proceedings, in addition to the mother's actions on February 12, 2004, the State argued before Circuit Judge Peter H. Lieberman that the mother "has exhibited a pattern of failing to protect her children from substantial harm or a potential for substantial harm." The mother moved to dismiss, alleging that this second petition was barred by the doctrine of res judicata.

[¶14.]      During a hearing on the motion to dismiss, the mother argued that the issues presented in the second petition were identical to those considered by Judge Caldwell in the previous action. In opposing the motion, the State asserted that the February 12 incident presented new facts not considered by Judge Caldwell. The State further contended that although it presented the February 12 incident to Judge Caldwell through the motion for reconsideration, she advised the State to file a second petition.

[¶15.]      Over the mother's objection, Judge Lieberman allowed Wollman to relate the phone conversation he had with Judge Caldwell. He testified that:

> Based upon the conversation I had with the court it was my understanding—my impression that the [c]ourt would not entertain the motion. In hindsight I guess I could have forced the issue and got a hearing scheduled, but the phone conversation left me with the impression that it would be fruitless and that a new petition would be the correct way to proceed.

In response to this testimony, the mother contended that the State could have and should have forced the issue with Judge Caldwell, and therefore the doctrine of res judicata precluded the State from proceeding with the second petition. Judge Lieberman denied the mother's motion to dismiss. He concluded that no final order existed addressing the merits of the February 12 incident, that the issues in the

new petition were not identical to the previous petition, and finally, that the issues in the new petition had not been previously litigated. Consequently, the court allowed the State to proceed with the second abuse and neglect petition.

[¶16.] An adjudicatory hearing was held on May 19, 2004. The mother testified on both direct and cross examination that she continued to visit T.O. after Judge Caldwell's oral dismissal on January 30, 2004. She further admitted that she brought J.S. with her when she visited him on February 12, 2004. When asked on cross examination if she was still married to T.O., she could not say one way or the other. She testified that there would be no harm in having the girls live with her and T.O. together, or in having T.O. visit the girls. More significantly, the mother testified that she believed T.O. was innocent and that none of the prior sexual contacts had ever happened.

[¶17.] In rendering its decision, the court took judicial notice of the previous abuse and neglect action in Lincoln County and T.O.'s criminal file. It further acknowledged that the previous petition was dismissed by Judge Caldwell. However, based on the mother's conduct since January 30, 2004, the court ruled that the allegations in the second petition were established by clear and convincing evidence. The court declared that "it is inescapable that [the mother] and [T.O.] intend to continue their relationship." Therefore, the court adjudicated the children abused and neglected in that they lacked proper parental care and were threatened with substantial harm under SDCL 26-8A-2(2) and (6).

[¶18.] After the adjudication, the State moved to excuse the requirement that DSS provide reasonable efforts to reunite the mother with her children. The State

alleged that under SDCL 26-8A-21.1(7), DSS was "not required to seek reunification of a child with a parent who has exposed the children to or demonstrated the inability to protect the children from substantial harm or the risk of substantial harm and the child or another child had been removed from the parent's custody because the removed child was adjudicated to be abused and neglected by a [c]ourt on at least one previous occasion." The court found that both requirements under this statute had been met and excused any obligation on the part of DSS to provide reasonable efforts to reunify the family. According to the court, despite all the previous efforts by the social workers, the mother "still does not understand what it takes to keep her children safe from abuse." Moreover, the court found "incredible" the mother's latest assertions that she will protect the children from T.O. In the court's view, her promises were made "to placate the Department of Social Services, the special advocate and the [circuit court]."

[¶19.]    After the court declared that DSS was not required to provide reasonable efforts, the State moved to terminate the mother's parental rights. The court found that the conditions that led to the removal of the children still existed, in that the mother still failed to understand what it takes to protect her children. Moreover, the court found that there was little likelihood that the conditions would change because she failed "to acknowledge that [T.O.] sexually assaulted her minor children and has refused to protect her children from their abuser." The court further declared the mother unfit and that "potential harm could result to the children were they to be returned to [her] custody." In sum, the court found that the least restrictive alternative was to terminate the mother's parental rights.

Otherwise, the court believed that it "would be gambling with the future of the minor children if they were to be returned to the custody of [the mother]."

[¶20.]     The mother appeals asserting that (1) the doctrine of res judicata prohibited the circuit court from acquiring jurisdiction over this abuse and neglect petition; (2) the court erred when it adjudicated the children abused and neglected; (3) the court erred when it granted the State's motion to excuse reasonable efforts to reunite the family; and (4) termination was not the least restrictive alternative commensurate with the children's best interests.

## Analysis and Decision

### 1. Res Judicata

[¶21.]     We review de novo a circuit court's ruling on the issue of res judicata. Wells v. Wells, 2005 SD 67, ¶11, 698 NW2d 504, 507 (citing Banks v. Int'l Union Elec., Elec., Technical, Salaried and Mach. Workers, 390 F3d 1049, 1052 (8thCir 2004) (citation omitted)).  Here, Circuit Judge Lieberman concluded that res judicata did not apply because the allegations contained in the second petition were new, lacked a final judgment on the merits, and were not and could not have been previously litigated.  In contrast, the mother contends that Judge Caldwell heard the same allegations in the first petition that were then repeated in the second petition, Judge Caldwell still had jurisdiction when the February 2004 incidents occurred, and the State failed to bring the matter on for hearing before the case was dismissed.  Therefore, the mother insists that there exists a final judgment on the merits.

[¶22.]    To invoke the doctrine of res judicata, four elements must be established:  1) a final judgment on the merits in an earlier action; (2) the question decided in the former action is the same as the one decided in the present action; (3) the parties are the same; and (4) there was a full and fair opportunity to litigate the issues in the prior proceeding.  Moe v. Moe, 496 NW2d 593, 595 (SD 1993) (citation omitted).  In examining whether these elements are present, a court should construe the doctrine liberally, unrestricted by technicalities.  However, because the doctrine bars any subsequent litigation, it should not be used to defeat the ends of justice.  Instead, courts "must give careful consideration to the case at hand before erecting the doctrine's preclusive bar." *Cf.* Federated Depart. Stores, Inc. v. Moitie, 452 US 394, 401, 101 SCt 2424, 2429, 69 LEd2d 103 (1981); Brown v. Felsen, 442 US 127, 132, 99 SCt 2205, 2209, 60 LEd2d 767 (1979).

[¶23.]    The doctrine of res judicata is premised on two maxims:  "'A [person] should not be twice vexed for the same cause' and 'it is for the public good that there be an end to litigation.'"  Carr v. Preslar*, 73 SD 610, 619, 47 NW2d 497, 502 (1951) (citations omitted).  Res judicata seeks to promote judicial efficiency by preventing repetitive litigation over the same dispute. *Wells*, 2005 SD 67, ¶15, 698 NW2d at 508 (citing Faulk v. Faulk*, 2002 SD 51, ¶16, 644 NW2d 632, 635) (additional citation omitted).  This being so, it is important to consider the nature of abuse and neglect proceedings.  The protection of children from continuing abuse and neglect is not the type of needless litigation contemplated by the doctrine. *See Interest of J.J.T. and T.J.T.*, 877 P2d 161, 164 (UtahCtApp 1994) ("to effectively determine the

best interests of a child, a court must be free from the imposition of artificial constraints that serve merely to advance the cause of judicial economy").

[¶24.] Longstanding jurisprudence recognizes that special concerns may warrant exceptions to claim preclusion: "The strongest justification arises from cases in which disposition of the first action has failed to provide any tolerable resolution of a continuing problem." Wright & Miller, 18 Fed Prac & Proc Juris 2d § 4415, *Exceptions To Claim Preclusion Rules*. In particular, when it comes to protecting children res judicata should be cautiously applied. Other courts have expressed similar sentiments. In *People in Interest of J.R.*, 711 P2d 701, 703 (ColoCtApp 1985), the court noted that "[a]lthough the policy of limiting litigation is sound, that policy should not be applied so as to deprive the State in its role as *parens patriae* from seeking a resolution which will best serve the interests of the children."

[¶25.] In this regard, the Oregon Court of Appeals is worth quoting at length:

> Termination of parental rights proceedings generally arise out of a continuing and cumulative set of circumstances, in which the child is within the juvenile court's jurisdiction and, often, is subject to agency custody or supervision. An order denying a petition to terminate parental rights seldom leads directly to the termination of wardship or of agency involvement. It is one thing to say that such an order bars a second termination proceeding when there has been *no* change in the operative facts which led to the initiation of the first proceeding; it is very different—and clearly wrong—to contend that, if new substantial material facts come into existence which justify the filing of a new termination proceeding, evidence and facts which were or could have been considered in the earlier proceeding cannot be considered or reconsidered in the later one.

*In the Matter of* Newman, 619 P2d 901, 905 (OrCtApp 1980) (emphasis added).

[¶26.]	In expressing a like sentiment, the Connecticut Supreme Court, in the case of *In re Juvenile Appeal*, 460 A2d 1277, 1282 (Conn 1983), wrote:

> The judicial doctrines of res judicata and collateral estoppel are based on the public policy that a party should not be able to relitigate a matter which it already has had an opportunity to litigate. [Citations omitted]. Stability in judgments grants to parties and others the certainty in the management of their affairs which results when a controversy is finally laid to rest. *The doctrines of preclusion, however, should be flexible and must give way when their mechanical application would frustrate other social policies based on values equally or more important than the convenience afforded by finality in legal controversies.*

(Emphasis added) (citations omitted); *In re* Marriage of Weaver, 592 NE2d 643, 649 (IllAppCt 1992) (the doctrine "should not be strictly applied to bar evidence when the most important consideration is the welfare of a child"); Boone v. Boone, 150 F2d 153 (DCCir 1945).

[¶27.]	When it comes to balancing child protection against judicial economy in preventing repetitive claims, the Utah Court of Appeals summed up the problem well:

> A more fundamental question, however, is whether the judicial doctrine of res judicata has any application in proceedings involving the welfare of children. Mindful of the unique nature of child custody and related proceedings, we share the concerns expressed by the courts which have recognized that a hyper-technical application of res judicata is improper in adjudications where the welfare of children is at stake. [Footnote omitted]. Considerations regarding a child's welfare are rarely, if ever, static. In fact, it is more likely that the child's environment is constantly evolving, thus justifying the court's continuing jurisdiction. *See* Scott v. Department of Social Servs*., 76 MdApp 357, 545 A2d 81, 90 (1988) ("child welfare seems to be a particularly appealing subject for periodic redetermination because children can be quickly and irretrievably scarred by negative circumstances"), *cert. denied,* 492 US 910, 109 SCt 3226, 106 LEd2d 575 (1989).

*J.J.T. and T.J.T.*, 877 P2d at 163. *See also In re* Pardee, 475 NW2d 870, 874 (MichCtApp 1991) (res judicata "cannot settle the question of a child's welfare for all time"); *In re* V.B., 370 NW2d 119, 121 (Neb 1985) (same).

[¶28.]     Although South Dakota has no case directly on point, we can find some guidance in the case of *In re J.L.H.*, 299 NW2d 812, 815 (SD 1980), *rev'd on other grounds, In re J. L. H.*, 316 NW2d 650 (SD 1982). There, in rejecting the mother's res judicata argument, this Court held that "the trial court did not err in admitting evidence originating prior to the earlier adjudication." *Id.* Apparently, this evidence could have been offered in the first adjudicatory hearing but was not. Nonetheless, this Court found that because there had been a finding of dependency and neglect in the first proceeding, res judicata did not bar admission of this evidence in the second adjudicatory proceeding.

[¶29.]     Likewise, in this case the children were found abused and neglected as alleged in the first petition. Then, during the dispositional phase, the incident where the mother again exposed her child to the man who had molested her was not formally brought before the court after it announced that the case was going to be dismissed. A motion to reconsider was filed, but the judge telephoned the State's Attorney, and, as a result, the State was left with the impression that the judge would not entertain the motion. In the second adjudicatory hearing before a new judge, this evidence was admitted. Perhaps the evidence should have been formally brought before the first court, even though the court indicated that the motion would not be successful, but simply because the State did not insist on a hearing should not preclude the new evidence from being used in the second proceeding.

After all, there is no dispute that the judge indicated that she would not entertain it. A hyper-technical application of res judicata is simply not appropriate in these extraordinary circumstances. Even if we were to say that the attorneys blundered in failing to insist that the matter be heard by Judge Caldwell, the children's welfare still demands that we place greater emphasis on their protection than on a judicial policy against repeat litigation.[2] To hold otherwise is to turn our legal process for protecting abused and neglected children into a hollow ritual.

### 2. Adjudication of Abuse and Neglect

[¶30.]     The mother next contends that the circuit court erred when it adjudicated the children abused and neglected. Specifically, the mother asserts that the court was not permitted to use matters litigated in the previous abuse and neglect proceedings as grounds for the current adjudication. Without those matters, she claims, the circumstances surrounding the February 12 incident do not provide sufficient evidence to support the court's adjudication.

---

2.    The dissent seems to equate the dismissal of the first abuse and neglect proceeding with a finding that the children were not found to be abused and neglected in that case. On the contrary, Circuit Judge Caldwell found that these children were abused and neglected. The dismissal was given only because Judge Caldwell later believed the mother had rehabilitated herself, a conclusion that afterwards proved false. Unlike the case of *Matter of N.J.W.*, 273 NW2d 134 (SD 1978), the State here is not attacking an earlier adjudication holding that prior allegations of abuse were not proved. Rather, the State is relying on the findings in the earlier case to support its position in the present case. Judge Caldwell found in the first adjudication that the mother repeatedly exposed her daughters to a man who she knew had sexually molested them. The second proceeding only added additional evidence to support this same finding. *See In re* R.Z.F., 284 NW2d 879, 881 (SD 1979).

[¶31.]     An adjudication of abuse and neglect must be supported by clear and convincing evidence. *Interest of* D.T., Jr., 2003 SD 88, ¶10, 667 NW2d 694, 698 (citing *Matter of* J.A.H., 502 NW2d 120, 123 (SD 1993) (additional citations omitted)). We review the circuit court's findings of fact under the clearly erroneous standard, giving due regard to the "court's opportunity to judge the credibility of the witnesses." *Interest of* T.G., 1998 SD 54, ¶16, 578 NW2d 921, 923 (citation omitted). We think it was within the court's discretion to take judicial notice of the findings from the previous adjudication. *D.T., Jr.,* 2003 SD 88, ¶10, 667 NW2d at 698 (citing *J.A.H.,* 502 NW2d at 123; *Matter of* L.B., 416 NW2d 598, 599 (SD 1987); *Matter of* R.Z.F., 284 NW2d 879, 881 (SD 1979); *In re* K.D.E., 87 SD 501, 506, 210 NW2d 907, 910 (SD 1973)). Moreover, because the court is required to act in the best interest of the children, it is not improper for a court to consider the circumstances that brought about the previous adjudication.

[¶32.]     In this case, the court took judicial notice of the previous adjudication of abuse and neglect in Lincoln County. In its factual findings, it also repeated verbatim the findings in the previous adjudication. In doing so, the court was not relitigating the previous case. Rather, the court was using the prior findings to recite the children's history so as to declare what was in the children's best interests based on the entire relationship between the children and the mother. *See R.Z.F.,* 284 NW2d at 881. Ultimately, however, it still remains our task to examine whether the circuit court erred when it adjudicated the children abused and neglected. Based on our review of the evidence we cannot say that we are left with a definite and firm conviction that a mistake was made. It is undisputed that T.O.

sexually abused the mother's children. The mother, nevertheless, continued to have a relationship with T.O. In fact, she admitted that she exposed J.S. to T.O. on February 12, 2004. Certainly, the evidence supports the court's conclusion that clear and convincing evidence existed that the children "lacked proper parental care through the actions or omissions of [the mother] and were threatened with substantial harm[.]"

### 3. Reasonable Efforts

[¶33.]     The mother also contends that the court abused its discretion when it held that DSS was excused from having to provide reasonable efforts toward family reunification. Under SDCL 26-8A-21, DSS "shall make reasonable efforts to make it possible for the child to return to the home of the child's parents, guardian, or custodian." However, under the Adoption and Safe Families Act (ASFA), DSS is not required to provide reasonable efforts when certain aggravating circumstances exist. SDCL 26-8A-21.1; *see also Interest of* J.S.B., Jr., 2005 SD 3, ¶1, 691 NW2d 611, 613; *Interest of* D.B., 2003 SD 113, ¶13, 670 NW2d 67, 71 (quoting New Jersey Div. of Youth and Fam. Serv. v. A.R.G., 824 A2d 213, 233 (NJSuperCtAppDiv 2003)). Accordingly, "SDCL 26-8A-21.1 provides the trial court with discretion to identify the most egregious cases early in the process and dispense with futile efforts toward reunification." *D.B.*, 2003 SD 113, ¶15, 670 NW2d at 72.

[¶34.]     In this case, the court held that reasonable efforts were not required because the mother "[h]as exposed the child to or demonstrated an inability to protect the child from substantial harm or the risk of substantial harm, and the child or another child has been removed from the parent's custody because the

removed child was adjudicated abused and neglected by a court on at least one previous occasion." SDCL 26-8A-21.1(7). In making this determination, the court found that the evidence clearly and convincingly established that the mother "still does not understand what it takes to keep her children safe from abuse." The court noted that the children had been previously adjudicated abused and neglected. It further recognized that the mother admitted to exposing J.S. to T.O. when she visited him at approximately 10:30 p.m. in an unused parking lot by the John Morrell facility. Moreover, she advocated his innocence and testified that there would not be any harm in allowing contact between T.O. and the children. It was not until the hearing to determine if reasonable efforts were required that the mother then declared that she believed her children were abused by T.O. The court held that the mother's statement at that time was "incredible" because it was "being made to placate [DSS], the special advocate and the [c]ourt."

[¶35.]    The mother, nevertheless, argues that the evidence does not establish that this is an egregious case with compelling circumstances because the court relied on impermissible evidence from the prior adjudication to determine that the aggravating factor in SDCL 26-8A-21.1(7) existed. She further contends that the court was collaterally estopped from admitting evidence from the previous adjudication, as it was a matter already litigated. We previously stated that it is within a court's discretion to take judicial notice of a child's prior adjudication of abuse and neglect. It would be untenable to conclude that while taking judicial notice of the prior case, the court is not then permitted to examine evidence from that action. To properly consider the best interests of the child, the entire historical

-17-

record is crucial. Moreover, the court in this case did not make its own factual findings with respect to what occurred in the prior action. It incorporated the original findings verbatim. In consideration of the circumstances surrounding the previous adjudication along with the mother's actions and testimony, the court declared that DSS was not required to provide reasonable efforts toward reunification. Based on our review of the evidence, we cannot say the court erred.

### 4. Least Restrictive Alternative

[¶36.]     Finally, the mother argues that terminating her parental rights was not the least restrictive alternative because the conditions that led to the children's removal no longer exist. "Our standard of review is 'whether the trial court's ultimate finding—that clear and convincing evidence indicated termination was the least restrictive alternative commensurate with the child's best interests—was clearly erroneous.'" *In re* S.A. 2005 SD 120, ¶21, 708 NW2d 673, 680 (quoting *In re* A.S., 2000 SD 94, ¶19, 614 NW2d 383, 386 (quoting *In re* J.Y., 502 NW2d 860, 862 (SD 1993))); *see also* SDCL 26-8A-27.

[¶37.]     Before terminating the mother's parental rights, the court properly weighed her fundamental right as a parent against the best interests of the children. Based on the evidence, the court concluded that preserving her parental rights "would materially jeopardize the best interests of the children and would compromise the duties and interest of the public to prevent the [subjection] of the children to future potential harm and detriment." This, according to the court, is because the mother "still does not understand what it takes to protect her children and . . . if [the mother] were forced to choose between [her] children and their

-18-

abuser, [she] would choose their abuser." Finding that potential harm could result, the court declared that under all the circumstances it "would be gambling with the future of the minor children if they were to be returned to the custody of the [mother]."

[¶38.] The mother's fundamental rights as a parent deserve protection, but the children's best interests remain the highest priority. *Interest of* T.G. and C.G., 1998 SD 54, ¶16, 578 NW2d 921, 923. There is no dispute here that the mother has repeatedly exposed her children to a man who had previously molested all three of them. Although she originally reported the sexual abuse, she later testified that the abuser was innocent and that there would be no harm to her children in remaining in contact with him. It is true that she finally stated that she believed T.O. did abuse her daughters, but the court found her late change of heart to be untrustworthy.

[¶39.] We have consistently held that children are not required to wait for their parents to acquire parenting skills. *See Interest of* P.K., 2006 SD 17, ¶24, 711 NW2d 248, 256 (citing *Interest of* A.D., 416 NW2d 264, 268 (SD 1987)); *People in Interest of* M.J.B., 364 NW2d 921 (SD 1985). "'When it comes to something as important as the welfare of young children, promises of the parents to conform to the standard of care for their children which is expected in our society do not carry as much weight as their past actions of not properly caring for the children.'" *A.S.*, 2000 SD 94, ¶21, 614 NW2d at 386-87 (quoting *In re* E.D.J., 499 NW2d 130, 137 (SD 1993) (quoting *In re* J.M.V.D., 285 NW2d 853, 855 (SD 1979))). We find no error in the circuit court's conclusion that termination of the mother's parental rights was

the least restrictive alternative commensurate with the best interests of L.S., J.S., and C.S.

[¶40.]        Affirmed.

[¶41.]        GILBERTSON, Chief Justice, and ZINTER, Justice, concur specially.

[¶42.]        SABERS, Justice and MILLER, Retired Justice, dissent.

[¶43.]        MILLER, Retired Justice, sitting for MEIERHENRY, Justice, disqualified.


ZINTER, Justice (concurring specially).

[¶44.]        I concur and write only to note that, contrary to the dissent's view, the affirmance of the trial court's judgment does not create a new "exception" to the bar of res judicata in abuse and neglect cases.[3]  *See infra* ¶¶52 & 66.  Rather, the

---

3.    A close reading of the Court's authorities reflects that each case applies a generally recognized requirement for, rather than an abuse and neglect exception to, the bar of res judicata.  *See State in Interest of* J.J.T., 877 P2d 161, 164 (UtahCtApp 1994) (noting that through a strict application of "traditional res judicata analysis, uninfluenced by [exception] concerns, . . . the prior neglect determination [was] no bar to the termination petition at issue." The Utah court expressly saved for another day the difficult question of whether, and to what extent, res judicata actually applies in the context of termination of parental rights.); *People in Interest of* J.R., 711 P2d 701, 703 (ColoCtApp 1985) (involving the *same proceeding* in which additional facts were presented to the trial court justifying a change in its conclusions from a previous hearing where it refused to terminate the parent-child legal relationship); *Matter of* Newman. 49 OrApp 221, 226, 619 P2d 901, 904-05 (1980) (concluding "if new substantial material facts come into existence which justify the filing of a new termination proceeding, evidence and facts which were or could have been considered in the earlier proceeding can be considered or reconsidered in the later one"); *In re* Juvenile Appeal (83-DE), 190 Conn 310, 315, 460 A2d 1277, 1280 (1983) (permitting the second petition because "the dismissal of the first petition was based on the trial court's determination that the [first] petition, filed only four months after K was

(continued . . .)

judgment is properly affirmed because the fourth *requirement* of res judicata is not present; *i.e.*, there was no full and fair opportunity to litigate the most recent allegation of abuse of the children.

[¶45.]      A well-established *requirement of* res judicata is that there must have been "a full and fair opportunity to litigate the issues in the prior adjudication." Springer v. Black, 520 NW2d 77, 79 (SD 1994) (emphasis added) (quoting *In re* Guardianship of Janke, 500 NW2d 207, 208-09 (SD 1993) (citations omitted)). But, in this case, there is no dispute that the first trial judge (Judge Caldwell) declined to consider the new allegation that Mother again exposed the children to their molester.[4] Thus, there was no full opportunity to litigate the new allegation.

[¶46.]      Although the record is limited, there is no dispute that Judge Caldwell made an oral disposition that dismissed the abuse and neglect proceeding before the new incident occurred. There is also no dispute that after the new incident, Judge

---

(. . . continued)
   committed, was premature"); *In re* Pardee, 190 MichApp 243, 248, 475 NW2d
   870, 873 (1991) (noting that "when the facts have changed or new facts
   develop, the dismissal of a prior termination proceeding will not operate as a
   bar to a subsequent termination proceeding"); *In re Interest of* V.B., 220 Neb
   369, 372, 370 NW2d 119, 122 (1985) (noting that evidence from the first
   proceeding could be used in conjunction with evidence from the time period
   after the first proceeding in determining that there was the requisite change
   of circumstances to terminate parental rights.)

4.   There is absolutely no evidence to support the dissent's view that
   "apparently" Judge Caldwell "did not believe the [new] incident warranted
   changing her decision," or that the state's attorney did not "bring the matter
   to a hearing because he thought the State was going to lose." *Infra* ¶¶8-9.
   On the contrary, as is explained hereafter, the evidence is quite clear that
   Judge Caldwell dismissed the first proceeding *without considering* the new
   allegation because she believed that it should be presented in the new
   petition.

Caldwell was informed of the new evidence when the State filed a motion to reconsider. However, Judge Caldwell advised the State that she would not even entertain the motion and that the State should file a new petition.

[¶47.]     Although Mother and the dissent have a different appellate view of these facts, the State offered the only *evidence* concerning these matters. Lincoln County State's Attorney Thomas Wollman testified, without qualification, that after he filed the motion to consider the new allegation, *Judge Caldwell initiated* a telephone call to his office. From that conversation, he understood that "the court [Judge Caldwell] would not *entertain* the motion." Wollman testified that Judge Caldwell indicated "that a new petition would be the correct way to proceed."[5] After considering all of the evidence concerning this matter in a contested hearing, Judge Lieberman adopted Wollman's testimony. Judge Lieberman specifically found that Judge Caldwell informed Wollman that she would not consider the matter and that the new allegation constituted a basis for a new petition. In finding of fact 17, Judge Lieberman found:

> The court informed Lincoln County State's Attorney, Tom Wollman, that it no longer had jurisdiction over the matter due to its order dismissing the Petition on January 30, 2004 and declined to hear the State's Motion for Reconsideration.

---

5.     Q: Was there a point in time that the judge *ever heard* your motion for reconsideration on the record?

   A: *No.* Based upon the conversation I had with the Court it was my understanding - my impression that *the Court would not entertain the motion.* In hindsight I guess I could have forced the issue and got a hearing scheduled, but the phone conversation left me with the impression that it would be fruitless and that *a new petition would be the correct way to proceed.*

And, in finding of fact 18, he found:

> The Lincoln County State's Attorney, Tom Wollman, was advised by the court that the incident on February 12, 2004, constituted facts for a new Abuse and Neglect Petition, as the previous abuse and neglect proceeding (Juv. 02-83) was dismissed.

[¶48.] These findings cannot now be contested on appeal. First, there is no real dispute that, at Judge Caldwell's direction, no final appealable order *relating to the new incident* was entered in the first proceeding.[6] But more importantly, Mother conceded that these were different actions based on different allegations and that the State was not provided an opportunity to litigate the new allegation. Specifically, at the hearing on the motion to dismiss in front of Judge Lieberman, Mother argued that both actions (in both courts) alleged that she had failed to protect her children against a child abuser who had previously abused them. However, Mother conceded that the actions were not the same because the second action involved "almost the same" allegation but "that . . . something . . . happened after Judge Caldwell's decision." With respect to the new evidence, Mother further conceded that Judge Caldwell "knew about the motion to reconsider [based on the new evidence] and *she refused to hear it*." (Emphasis added.) Mother even conceded that Judge Caldwell "would not give [the State] a hearing on their motion [to

---

6. The dissent faults the State for failing to appeal. However, because of Judge Caldwell's oral telephonic direction, there was no order, judgment, or even record from which the State could appeal. The only record of Judge Caldwell's disposition of the new evidence was developed before Judge Lieberman after the second petition was filed. And, it is easy to understand why the *state's attorney* could not have scheduled a motion hearing on *Judge Caldwell's docket* after she had just informed him that she would not consider the matter and that a new petition should be filed.

reconsider]." Consequently, on appeal, there is no room to now adopt new appellate facts and suggest that the State was given a *full and fair* opportunity to litigate the new evidence in the first action.

[¶49.]     In the final analysis, there is no dispute that res judicata bars matters that could have been litigated in the prior proceeding. However, as Judge Lieberman specifically concluded, the "issue presented in the Minnehaha County Abuse and Neglect Petition was not actually litigated nor could [it] have been litigated" in the prior proceeding. Furthermore, considering Mother's concessions and Judge Caldwell's specific direction to the state's attorney, this record supports the second trial court's finding that the State did not have a full and fair opportunity to litigate the new allegation in the first abuse and neglect proceeding.

[¶50.]     Because there was no full and fair opportunity to litigate the new facts concerning Mother's subsequent failure to protect the children from their molester, those facts were not precluded from consideration in a second action. They were not precluded because if "[t]he facts which underlie many of the issues do not arise until [after the prior court proceeding,] the doctrine of res judicata . . . does not apply." Lewton v. McCauley, 460 NW2d 728, 731 (SD 1990); *see also supra* n3. For all of these reasons, this case is governed by established requirements of res judicata.

[¶51.]     GILBERTSON, Chief Justice, joins this special writing.


SABERS, Justice (dissenting).

[¶52.]     When a party loses and fails to appeal, the case is finished. Today, the majority opinion grants an exception to the State when it is seeking to terminate

the parental rights of one of its citizens. The majority opinion sends a disturbing message: If at first you don't succeed in terminating an individual's parental rights, do not bother appealing to this Court, just keep filing additional petitions in different counties until you find a judge that will rule in your favor. This case presents a blatant example of forum shopping and I dissent.

[¶53.]    Termination of parental rights is a custody proceeding. *In re* H.L.C. & B.A.C., 2005 SD 110, ¶24, 706 NW2d 90, 94 (citing *In re* M.C.S., 504 NW2d 322, 326 (SD 1993)). Application of the doctrine of res judicata to custody actions is different than other proceedings, because custody actions are subject to modification. However, one thing is clear: before a custody decree can be modified, new facts must occur subsequent to the first decree.

[¶54.]    In a custody dispute between parents, we require a substantial change in circumstances. *See* Masek v. Masek, 90 SD 1, 6, 237 NW2d 432, 434 (1976) (urging this Court to "be especially vigilant to avoid rewarding persistence in this type of case"); Huckfeldt v. Huckfeldt, 82 SD 344, 348, 146 NW2d 57, 59 (1966) (noting that an award of custody is res judicata under conditions existing when made because "any other interpretation would result in endless litigation and continued uncertainty"). In *In re* N.J.W., we examined the effects of res judicata in subsequent abuse and neglect proceedings and determined "the same principle . . . appl[ies]. . . ." 273 NW2d 134, 138 (SD 1978) (citing *Huckfeldt*, 82 SD at 348, 146 NW2d at 59)).

[¶55.]    The parents involved in termination proceedings should be afforded a degree of certainty concerning their right to raise and care for their children. The

best interests of the children are also served by the stability of a final judgment.

Indeed, the nature of the State as an adversary coupled with the extreme

consequences of termination should make us more vigilant in these types of cases.

When the United States Supreme Court mandated a burden of clear and convincing

evidence in termination of parental rights cases, it noted:

> The disparity between the adversaries' litigation resources is matched by a striking asymmetry in their litigation options. Unlike criminal defendants, natural parents have no "double jeopardy" defense against repeated state termination efforts. If the State initially fails to win termination . . . it always can try once again to cut off the parents' rights after gathering more or better evidence. Yet even when the parents have attained the level of fitness required by the State, they have no similar means by which they can forestall future termination efforts.

Santosky v. Kramer, 455 US 745, 764, 102 SCt 1388, 1400, 71 LE2d 599 (1982). In

holding that res judicata applies to subsequent termination cases, the Texas Court

of Appeals remarked, "[t]o hold otherwise would be to allow the State with its vast

resources to try the same issues over and over again to the disadvantage of the

parents." Slatton v. Brazoria County Protective Serv., 804 SW2d 550, 553 (TexApp

1991).[7]

---

7.     Several courts have followed this rationale. *See In re* V.B. & Z.B., 370 NW2d 119, 122 (Neb 1985) (holding "the [trial] court would have been barred in the instant case from using evidence prior to the [first] order as the sole basis for terminating parental rights"); *In re* A.S., M.S. & A.L.S., 752 P2d 705, 711 (KanCtApp 1988) (permitting a subsequent termination proceeding to go forward after being "satisfied that a change of circumstances occurred after [the first order had been issued]"); *In re* J.R., J.R., & T.R., 711 P2d 701, 703 (ColoCtApp 1985) (holding "there should be . . . sufficient additional facts to justify a trial court's change in its conclusions from a previous hearing at which it refused to terminate the parent-child legal relationship"); *In re* John B., 570 A2d 237, 240 (ConnAppCt 1990) (permitting a second termination proceeding when "new facts that justified the bringing of a second

(continued . . .)

[¶56.]    We apply four factors in determining whether res judicata bars a subsequent action: (1) whether the issue decided in the former adjudication is identical with the present issue; (2) whether there was a final judgment on the merits; (3) whether the parties are identical; and (4) whether there was a full and fair opportunity to litigate the issues in the prior adjudication. Moe v. Moe, 496 NW2d 593, 595 (SD 1993) (citing Raschke v. DeGraff, 81 SD 291, 295, 134 NW2d 294, 296 (1965)). A prior final judgment or order that was rendered by a court of competent jurisdiction, "is conclusive as to all rights, questions, or facts directly involved and actually, or by necessary implication, determined therein." *Id.* (quoting *Raschke*, 81 SD at 296, 134 NW2d at 297). A final judgment is conclusive without regard to whether the rendering court was correct at the time it made its decision. *Id.*

*Whether the issue decided in Lincoln County is identical to the issue in the Minnehaha County petition.*

[¶57.]    The Lincoln County and the Minnehaha County petitions are identical in almost every respect. They both sought to adjudicate Mother's children as abused and neglected. They both alleged that Mother had failed to protect her children from T.O. Finally, they both recite the sexual contact between T.O. and

---

(. . . continued)

    termination proceeding came into being after the dismissal of the first proceeding"); *In re* B.M., 1999 No 98-2175, WL 823851 *4 (IowaApp Oct 15, 1999) (unpublished opinion) ("if the state had brought the second petition to terminate appellant's rights and had alleged nothing new, there is no doubt that it would be barred by res judicata"); *In re* Newman, 619 P2d 901, 904 (OrCtApp 1980) (upholding a termination when "there was at least one new substantial material fact . . . which came into being between the first and second termination proceedings").

Mother's children, as well as the fact that Mother married T.O. subsequent to his abuse of the children.

[¶58.] The only respect in which the petitions differ is that the Minnehaha County petition includes the Morrell incident. It also includes information that William Golden, the children's attorney, gathered as a result of a conversation he had with one of the children concerning the Morrell incident. The State argued, and Judge Lieberman agreed, that the Morrell incident creates a different issue or at least new facts relevant to that issue. However, the record reveals that the Morrell incident was raised in the Lincoln County proceeding.

[¶59.] Before Judge Caldwell signed the order dismissing the Lincoln County proceeding, the State made a motion to reconsider. The State's motion was based entirely on the Morrell incident, and included an affidavit by William Golden concerning the conversation he had with one of the girls about that incident. Apparently, Judge Caldwell did not believe the incident warranted changing her decision. Thus, the issues and the facts were identical in both the Lincoln and Minnehaha County proceedings. Judge Lieberman erred in determining that the Minnehaha County petition presented issues and facts that were not presented to Judge Caldwell.

*Whether there was a final judgment on the merits.*

[¶60.] The State argues that there was no final judgment on the merits in the Lincoln County proceeding because Judge Caldwell did not hold a hearing on the motion, or issue an order denying the motion. Instead, Judge Caldwell simply issued her order dismissing the entire proceeding. The State's argument is

unpersuasive for two reasons. First, the state's attorney admitted that he could have scheduled a hearing in front of Judge Caldwell, but did not do so because he thought it would be "fruitless." In other words, he did not bring the matter to a hearing because he thought the State was going to lose. Fear that a party will not prevail on an issue has never excused them from raising it.

[¶61.]	Second, we have held that a decree from a dispositional hearing is a final judgment. In the Matter of S.H., 337 NW2d 179, 180 (SD 1983) (holding that it is the decree from the dispositional hearing that is "a final judgment" for purposes of appeal). If the State believed that Judge Caldwell erred in not reconsidering her oral ruling, it should have appealed the order of dismissal to this Court. Because the Morrell incident was presented to Judge Caldwell before she signed an order dismissing the proceeding, her order of dismissal constitutes a final judgment on the merits.

[¶62.]	In *Moore v. Michelin Tire Co., Inc.*, we noted that "pursuant to SDCL 15-6-58, an order becomes effective when reduced to writing, signed by the court or judge, attested by the clerk and filed in his office." 1999 SD 152, ¶46, 603 NW2d 513, 525 (quoting Mushitz v. First Bank of South Dakota, 457 NW2d 849, 857 (SD 1990)). "Orders are required to be in writing because the trial court may change its ruling before the order is signed and entered." *Id.* at ¶46 (quoting State v. Lowther, 434 NW2d 747, 752 (SD 1989)). When a trial court issues an oral ruling, it retains discretion to hear additional evidence prior to making its final order and reducing it to writing. *Id.* at ¶47. Judge Caldwell issued her written order of dismissal after the State made its motion to reconsider based on the Morrell incident.

Consequently, Judge Lieberman erred when he denied Mother's motion to dismiss, claiming there was no final judgment on the merits in the Lincoln County proceeding.

*Whether the parties are identical.*

[¶63.] The State concedes that the parties to the Minnehaha County proceeding were identical to those involved in the Lincoln County matter.

*Whether there was a full and fair opportunity to litigate the Morrell incident in the Lincoln County proceeding.*

[¶64.] To support its contention that there was no full and fair opportunity to litigate the motion for reconsideration, the State puts forth the same arguments it made pertaining to the final judgment on the merits. However, as mentioned above, the Lincoln County State's Attorney admitted that he could have pressed the issue and demanded a hearing on the State's motion. Moreover, the State had the opportunity to appeal the trial court's decision, but chose not to do so.[8] Instead,

---

8. The concurrence claims there is "absolutely no evidence to support" our view that Judge Caldwell did not believe the Morrell incident warranted changing her decision or that the state's attorney did not bring the matter because he thought he was going to lose. Additionally, the concurrence claims the State could not appeal because in the absence of a hearing, there was no record made on the issue. The concurrence is inaccurate on all three of its claims.

   The record is clear that Judge Caldwell received an affidavit setting forth the allegations surrounding the Morrell incident and the State's motion to reconsider. We know from the state's attorney's testimony that despite these allegations, Judge Caldwell was not going to entertain the motion for reconsideration. Furthermore, the state's attorney admitted that he could have "*forced the issue and got a hearing scheduled,* but the . . . conversation left [him] with the impression that it *would be fruitless.*" Thus, the state's attorney could have forced a hearing and made a record, but he did not do so because he did not believe Judge Caldwell was going to change her decision.

   (continued . . .)

they filed a new petition in Minnehaha County, the day after Judge Caldwell signed her order dismissing the case. The State cannot argue now that it was deprived of a full and fair opportunity to litigate the Morrell incident.

[¶65.] The doctrine of res judicata should bar the Minnehaha County proceeding. If the State believed the trial court's decision was in error, it should have appealed to this Court. When the State filed a new action in front of a different judge, it did precisely what the doctrine of res judicata seeks to avoid: forum shopping and relitigating issues and facts decided in a prior proceeding.

[¶66.] The majority opinion does not apply the four factors of res judicata to determine if the Minnehaha County proceeding was barred. Rather than attempt to pound a square peg in a round hole, the majority opinion cuts an entirely new hole in order to reach the result it believes is in the best interest of the children. Remarkably, this is done *sua sponte* as the State never raised the issue of whether res judicata applies to termination cases. Instead, the State only argued that the four elements of res judicata were not met.

------

(. . . continued)

Finally, all of this happened prior to Judge Caldwell issuing her final, written decision dismissing the State's claim.

As an appellate court, we have always required parties to create and preserve records, regardless of whether they believed it would be "fruitless" at the trial level. Moreover, we have always required parties to appeal from an adverse ruling, not file a new action in a different county in front of a different judge. Our standards should be no less stringent merely because one of the parties is the State, and the subject matter of the litigation involves termination of parental rights.

[¶67.]     The majority opinion cites several cases for the proposition that res judicata should not apply with full force in these types of proceedings.  I agree. Children are not static and their lives are constantly changing.  That is precisely why multiple abuse and neglect petitions can be filed when new facts come into existence *after the disposition of a prior proceeding*.  The majority opinion quotes the Oregon Court of Appeals which noted:

> [It is clearly wrong] to contend that, *if new substantial material facts come into existence which justify the filing of a new termination proceeding*, evidence and facts which were or could have been considered in the earlier proceeding cannot be considered or reconsidered in the later one.

*Newman*, 619 P2d 901, 904-05 (OrCtApp 1980) (emphasis added).  I have no disagreement with the statement of the Oregon Court.  However, the majority opinion cannot provide any "new substantial material facts" that came into existence after Judge Caldwell's order became final.  The facts relied on by the State in the Minnehaha County proceeding were the same facts the State relied on in making its motion to reconsider in the Lincoln County proceeding.

[¶68.]     I appreciate the majority opinion's concern for the best interest of the children.  Perhaps Judge Caldwell erred in failing to reconsider this case in light of the Morrell incident.  However, this Court should not ignore the law in an attempt to reach a desired result.  It is not relevant whether Judge Caldwell was "correct at [that] time or not" in determining whether her decision is res judicata.  *Moe*, 496 NW2d at 595. Judge Caldwell's decision was never appealed and was final in the absence of new facts.

[¶69.]    I will not join an opinion that allows the State to fail to bring a hearing because it thought it was going to lose, fail to appeal, and then bring a new action in a different county, based on the same facts, the very next day. Judge Lieberman's decision should be reversed and vacated.[9]

[¶70.]    MILLER, Retired Justice, joins this dissent.

---

9.    Because Judge Caldwell's decision is res judicata without new facts, I would not reach issues two, three, and four.